1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CALEEN SISK FRANCO, *et al.*,

11              Plaintiffs,                    NO. CIV S-09-1072 KJM-KJN

12        vs.

13   UNITED STATES DEPARTMENT OF
     THE INTERIOR, *et al.*,
14
                Defendants.                   <u>ORDER</u>
15   _____/

16              Plaintiffs are members of a non-federally recognized Indian tribe that resides in

17   the McCloud River Valley in Shasta County, California.  In this action, they contend defendants

18   United States Department of the Interior ("DOI"), Bureau of Reclamation ("BOR"), Bureau of

19   Indian Affairs ("BIA"), Bureau of Land Management ("BLM"), United States Forest Service

20   ("USFS") and United States Department of Agriculture ("USDA") (collectively, "defendants")[1]

21   have failed to protect historic and cultural sites that are important to them.  This matter is before

22   the court on defendants' motion to dismiss plaintiffs' second amended complaint.  The

23   _____

24        [1] At hearing, plaintiffs conceded that all defendants other than the USFS could be
     dismissed.  Later that day, plaintiffs submitted a retraction of that statement, noting that other
     federal defendants' presence would be necessary in order to obtain relief on plaintiffs' claims
25   related to the Shasta Reservoir Indian Cemetery.  (ECF 80.) Because the claims implicating that
     site are dismissed with prejudice, *infra* at 18–21, 28–30, DOI, BOR, BIA, BLM and USDA also
26   are dismissed from this action.

                                              1

1   Winnemem Wintu Tribe, Caleen Sisk Franco, and Mark Franco (collectively, "plaintiffs")

2   oppose defendants' motion.  The court heard argument on August 31, 2011.  Assistant United

3   States Attorney Erica Lynn Ernce appeared on behalf of the government defendants; Jayne

4   Flemming, Reed Smith LLP, appeared on behalf of the plaintiffs.  For the reasons set forth

5   herein, defendants' motion is GRANTED in part and DENIED in part.

6   I.      PROCEDURAL BACKGROUND

7             Plaintiffs filed their initial complaint on April 19, 2009, asserting equitable claims

8   under 28 U.S.C. §§ 1361, 2201-2202, violations of a litany of other statutes, a passing

9   miscitation to the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* ("APA") as a

10  jurisdictional basis for the action, and various claims under the Federal Tort Claims Act

11  ("FTCA") against the defendants as well as Secretary of the Interior Kenneth Salazar and

12  Secretary of Agriculture Tom Vilsack.  (ECF 1.)  On June 29, 2009, defendants moved to

13  dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6).  (ECF 8.)

14  On September 12, 2009, the court dismissed the FTCA claims with prejudice for lack of subject

15  matter jurisdiction and the claims against Salazar and Vilsack for failure to state a cognizable

16  claim.  (ECF 24.) In that order, the court found plaintiffs sufficiently alleged Article III standing

17  as well as prudential standing under the APA. (*Id.*)

18            Plaintiffs then focused their pleadings around the APA for violations of various

19  statutes and also asserted a claim under *Bivens v. Six Unknown Named Agents of the Federal*

20  *Bureau of Narcotics*, 403 U.S. 388 (1971).  On December 11, 2009, defendants moved to dismiss

21  the first amended complaint.  (ECF 33.) On July 16, 2010, the court denied defendants' motion

22  to dismiss on one claim but otherwise granted the motion, granting leave to amend on the

23  majority of claims.  (ECF 51.) In that order, the court cautioned plaintiffs that their claims "are

24  replete with vague, conclusory allegations . . . [that] generally fail to set forth how the numerous

25  statutes referenced have been violated or how defendants are responsible for the conduct or

26  /////

2

1  consequences at issue."  (ECF 51 at 22 n.5.)  The court allowed amendment so that these defects

2  could be remedied.

3          Plaintiffs filed their second amended complaint (the "SAC") on August 20, 2010.

4  (ECF 54.)  In this complaint, plaintiffs assert claims against defendants under the APA for

5  statutory violations of the Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa, *et seq.*,

6  National Historic Preservation Act, 16 U.S.C. §§ 470, *et seq.*, and the National Environmental

7  Policy Act, 42 U.S.C. §§ 4332 *et seq.*  Plaintiffs also seek declaratory relief regarding their rights

8  in the Shasta Reservoir Indian Cemetery.  As explained below, plaintiffs claim the USFS has

9  failed to protect several sites to which they attach religious and cultural significance as required

10  by the statutes on which they rely.[2]

11          On October 1, 2010, defendants moved to dismiss the SAC.  (ECF 55.)  On

12  January 20, 2011, the case was reassigned to the undersigned.  (ECF 68.)  On July 7, 2011, prior

13  to hearing, the court ordered further briefing on the standard of review applicable to a Rule

14  12(b)(1) motion attacking claims brought under the APA.  (ECF 74.)

15  II.    FACTUAL ALLEGATIONS

16          The Winnemem Wintu Tribe and its ancestors have lived in the Shasta Lake and

17  McCloud River area for six thousand years.  (SAC ¶ 39.) Their historic and cultural sites,

18  naturally, populate the region.  Plaintiffs challenge defendants' failure to protect various sites

19  around the McCloud River in Shasta County, California.  In particular, for each site, plaintiffs

20  claim that archaeological resources exist, and therefore the Archaeological Resources Protection

21  Act ("ARPA"), 16 U.S.C. §§ 470aa, *et seq.*, requires that the USFS either issue permits or

22

23      [2]  The Second Amended Complaint also offers a meandering history of Native American
peoples, an irrelevant reference to their comparative life expectancy, the history and purpose of

24  the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3002, which no longer
forms a basis for any of plaintiffs' claims, a disjointed, duplicative and largely irrelevant

25  summary of certain facts as well as vague and conclusory allegations related to their actual
claims. (*See* SAC ¶¶ 17, 37.)  Because plaintiffs have been warned previously to avoid such

26  pleading, (*see* ECF 51 at 22 n.5), they will not be given leave to include these allegations in
future pleadings.

1   prevent activities that harm those resources.  For some sites, as discussed below, plaintiffs claim

2   that the USFS is failing to protect historic properties from degradation in violation of  the

3   National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, *et seq*.  Also for some sites,

4   they claim that the USFS failed to develop environmental protection plans in violation of the

5   National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332, *et seq*.  Plaintiffs challenge

6   USFS actions and inaction based on the APA, which allows interested parties to challenge

7   federal agency activity.  5 U.S.C. § 702.

8        A.     Nosoni Creek (Claim 1)

9             Prior to the 1980s, the Winnemem Wintu ("Winnemem" or "Tribe") would camp

10   and initiate hunts at the Nosoni Creek site.  (SAC ¶ 46.)  Plaintiffs claim that the Nosoni Creek

11   site contains remains of past human life such as structures, graves, skeletal remains, pottery and

12   tools.  (*Id*. ¶¶ 69, 75.)  It is also the site of pre-historic house pits, a section of a pre-historic trail,

13   and the remains from a tribal hunting cabin built in or about 1867.  (*Id*. ¶ 70.)

14             In 2000, the USFS began a project to replace the Nosoni Creek bridge.  (*Id*. ¶ 71.)

15   The USFS allowed construction workers to cut down three ancient "grandfather" grapevines

16   used as medicine by the Tribe for over 100 years, as well as an ancient oak tree.  (*Id*. ¶¶ 46, 72.)

17   In addition, in 2001 to 2002, the USFS allowed a truck ramp to be built leading to the creek.

18   This ramp is used on a daily basis by logging trucks that drive over the site, park on the truck

19   ramp, and draw water from the creek four to five times per day, every day of the year.  (*Id*. ¶¶ 71,

20   84.)  These same trucks spill diesel onto the site and into the creek.  (*Id*. ¶¶ 72–73.)  Plaintiffs

21   aver this activity has destroyed archeological resources at the site.  (*Id*.)  Plaintiffs claim other

22   damages to Nosoni Creek without explaining whether they flow from the bridge or ramp

23   projects.  (*Id*. ¶¶ 47– 48.)

24             The Tribe was not notified prior to commencement of the bridge replacement or

25   the truck ramp, and defendants did not follow any public consultation process.  (*Id*. ¶ 77.)

26   Ignoring plaintiffs' persistent complaints, USFS has not done anything to remedy the alleged

4

harms.  (*Id.* ¶¶ 49, 77, 80.)  Plaintiffs also allege these construction activities were undertaken

without an ARPA permit.  (*Id.* ¶ 72.)  Work was done in July 2010 to fix the problems with the

truck ramp, but the Tribe was excluded from discussions of how to mitigate any damage.  (*Id.*

¶ 80.)  Plaintiffs allege that the bridge and truck ramp projects violates the ARPA because no

ARPA permits were issued (*id.* ¶ 72), that those projects violated NHPA because the bridge is a

historic site and the USFS failed to properly consult with the tribe prior to allowing construction

(*id.* ¶ 77), and that no environmental analysis preceded the truck ramp project in violation of

NEPA.  (*Id.* ¶ 83.)

   B. Dekkas Site and Gilman Road Shaded Fuelbreak Project (Claim 2)

    The Dekkas site is a "rock island" that rises above the McCloud River.  (*Id.* ¶ 95.)

Plaintiffs allege that in pre–historic times, Dekkas contained a lower bench where manzanita

grew, a middle bench that included a dance circle, cisterns and a sacred fire pit, and an upper

bench with numerous pit houses.  (*Id.* ¶ 88.)  Former tribal leader Florence Jones used the fire pit

for healing activities until her death in 2003.  (*Id.* ¶ 89.)  The fire pit was surrounded by special

rocks used to tell the journey of life of the Tribe, and the cisterns were used in a doctoring

ceremony.  (*Id.* ¶¶ 89–90.)  The Tribe attended to several trees that were used in religious rituals.

 (*Id.* ¶ 90.) In 2005, the USFS consulted with the Tribe regarding the site, agreed that the old-

growth manzanita was an important resource, filed a "protection plan," and flagged the area to

be preserved.  (*Id.* ¶ 91.)  Wood from these manzanita provided the sole source of fuel for the

fire pit.  (*Id.* ¶ 54.)  Nevertheless, in February 2005, the USFS destroyed the manzanita.  (*Id.*

¶¶ 54, 91.)  Plaintiffs allege their agreement with USFS was violated when the manzanita was

cut without an archaeologist or tribal representative onsite at the time.  (*Id.* ¶ 55.)  The USFS

allows open access to the site, which has led to ongoing damage from camping, the use of ATVs

and other recreational activity.  (*Id.* ¶¶ 53, 92.)  The damage includes vehicles driving over dance

grounds, burning trash and dislodging rocks around the sacred fire pit.  (*Id.* ¶ 92.)  Despite

requests, the USFS has not developed a mitigation plan to address the damage.  (*Id.* ¶ 92.)

1    Plaintiffs claim the USFS's failure to develop a mitigation plan along with their allowance of

2    destructive activities without a permit violates ARPA.  (*Id.* ¶¶ 92–93.)

3             The Tribe alleges it had an exclusive use permit for the site for many years.  (*Id.*

4    ¶ 102.)  In 2005, the USFS revoked the permit and the Tribe's requests for a new one were

5    denied.  (*Id.*)  The USFS stated the reason was because no permit was available for the Tribe to

6    apply for, despite other groups having been granted comparable permits.  (*Id.*)

7             The USFS implemented the Gilman Road Shaded Fuelbreak project on the

8    Dekkas site in 2001, 2003 and 2005.  (*Id.* ¶ 97.)  This project has damaged culturally important

9    trees on the site that the Tribe has cultivated.  (*Id.* ¶¶ 96–97, 100.)  While the fuelbreak project

10   was completed in 2005, related ongoing cleanup continues to threaten important resources.  (*Id.*

11   ¶ 100.)  Defendants did not consult with interested parties during the planning and execution of

12   the project even though the Tribe indicated an interest in consultation.  (*Id.* ¶¶ 98–99.)  Plaintiffs

13   also allege that the process defendants used to evaluate the land was inadequate under NHPA.

14   (*Id.* ¶ 99.)

15           C.    Coonrod Flat Cultural Site (Claim 3)

16           Coonrod Flat is a large, open, dry meadow on the lower slopes of Mt. Shasta,

17   bordered by Ash Creek to the north and old river beds to the south.  (*Id.* ¶ 109.)  The site

18   includes a pre-historic village with a fire pit used for the "August Ceremony," and house pits to

19   the northeast along the creek.  (*Id.* ¶¶ 109, 112.)  The site is listed on the National Register of

20   Historic Places ("National Register").  (*Id.* ¶ 110.)

21           The USFS allows campers, hikers, hunters and off-road vehicles to trespass over

22   ceremonial areas causing damage to the site.  (*Id.* ¶¶ 57, 107, 110.)  In 2005, the USFS issued a

23   grazing permit for a 5,000 acre allotment to a rancher, allowing cattle to defecate on the sacred

24   fire pit area as well as create habitual paths of 6–8 inches deep and degrade the riparian area near

25   Ash Creek.  (*Id.* ¶¶ 57, 107, 111.)  To minimize the damage, the Tribe requested to rebuild a

26   fence to control access to the site in 2005, but the USFS did not respond.  (*Id.* ¶ 57.)  Plaintiffs

1   allege that the USFS violated ARPA by allowing destruction to the area by persons not having

2   proper ARPA permits (*id*. ¶ 108) and violated NHPA by failing to formulate a preservation plan

3   for the area.  (*Id*. ¶ 112.)

4   　　　　D.　　Buck Saddle Prayer Site (Claim 4)

5   　　　　　　　Plaintiffs aver that the Buck Saddle prayer site is an historic site due to its age and

6   its association with important spiritual and religious activities in the past.  (*Id*. ¶ 121.)  The large

7   prayer rock at the site, approximately 10 feet by 10 feet in size with a bedrock base that has

8   numerous cupules, is a documented archaeological site.  (*Id*. ¶ 116.)  The USFS allowed damage

9   to occur at the site in 2007 when it permitted the construction of a bike path on the Clikapudi

10  trail, which leads to the prayer rock.  (*Id*. ¶¶ 59, 117, 128.)  Plaintiffs aver this violated ARPA.

11  The bike trail was a project funded and approved by the USFS.  (*Id*. ¶ 122.)  The Clikapudi bike

12  path ramp disturbed and damaged the rock site.  (*Id*. ¶¶ 117–118, 124.)  Despite complaints by

13  the Tribe, the USFS has failed to address this ongoing issue, nor has it developed a plan of

14  mitigation or protection of these resources.  (*Id*. ¶¶ 119, 128.)  Plaintiffs allege that defendants'

15  failure to develop a protection plan or consult with the Tribe prior to permitting the bike path

16  violate NHPA.  (*Id*. ¶ 124.)  In addition, plaintiffs allege the USFS has failed to perform any

17  environmental analysis on the effects of the bike path as required by NEPA.  (*Id*. ¶ 127.)

18  　　　　E.　　Panther Meadow (Claim 5)

19  　　　　　　　Panther Meadow is located on the south slope of Mt. Shasta just below the

20  timberline. It includes an upper and lower meadow and a large spring at its highest point.  (*Id*.

21  ¶ 137.)  Panther Meadow is listed on the National Register.  (*Id*.)  The spring is considered the

22  genesis point for the Winnemem and constitutes their primary cultural site.  (*Id*. ¶ 132.)  The site

23  is used for cultural events such as a tribal "World Renewal Ceremony" conducted since the early

24  1900s, as well as for healing, prayer and other ceremonies since pre-historic times.  (*Id*. ¶¶ 132,

25  137.)

26  /////

7

1        A large proportion of the public visitation to Mt. Shasta is concentrated in Panther

2   Meadow.  (*Id*. ¶ 141.)  Visitation has caused significant damage to important resources at the

3   site, including contaminating the spring and harming vegetation.  (*Id*. ¶ 133.)  Some members of

4   the public have scattered human cremation remains in the spring and the USFS has not

5   implemented any measures to stop the practice or apprehend the perpetrators.  (*Id*. ¶¶ 60,

6   140–141.)  Despite the Tribe's complaints, the USFS has failed to properly regulate public

7   visitation and use, or close the area to avoid ongoing damage.  (*Id*. ¶¶ 60, 133, 135.) The USFS

8   has not formulated any preservation plan for Panther Meadow.  (*Id*. ¶ 138.)  Plaintiffs claim that

9   by permitting visitors to degrade the area without ARPA permits, defendants have violated

10  ARPA (*id*. ¶ 133) and by failing to develop a protection plan for the area, they have violated

11  NHPA.  (*Id*.  ¶¶ 138–139.)

12       F.    Rocky Ridge (Claim 6)

13       Rocky Ridge is a pre-historic village site connected to a larger village complex.

14  (*Id*. ¶ 145.)  The village contained approximately 15 house pits and a burial site and would likely

15  contain remains of human culture, including food stuffs, broken crockery, stone and metal tools,

16  and organic matter.  (*Id*.) Plaintiffs aver the site is eligible for listing on the National Register

17  due to its age, its association with historic events such as doctoring, herbal medicine, cultural

18  and religious ceremonies, and its potential to yield archaeological resources.  (*Id*. ¶ 151.)

19       Jones Valley Resort operates a permitted parking lot near the site.  (*Id*. ¶ 147.)

20  The resort has been using the Rocky Ridge site adjacent to the permitted parking lot as an

21  overflow parking lot for recreational vehicles and boat trailers for more than a decade.  (*Id*.)  The

22  USFS maintains a gate to prevent access to the site, but the agency has allowed the Resort to

23  install its own lock to allow for this implicitly authorized use.  (*Id*. ¶ 152.)  The USFS is aware

24  that the "overflow" parking lot exists, but denies issuing any permit for the site and has said it

25  has no plans to authorize any permits.  (*Id*. ¶¶ 147, 152.)

26  /////

1    Plaintiffs have complained to the USFS about the parking lot and the damage to

2 important resources caused by its use.  (*Id.* ¶¶ 148–149.)  The USFS has not responded to

3 plaintiffs' complaints.  (*Id.*) Plaintiffs claim defendants' tacit approval of the overflow parking

4 lot violates both ARPA and NHPA.  (*Id.*  ¶¶ 150, 153, 154)

5   G.  Antler's Bridge Site (Claim 7)

6    The Antler's Bridge site is the location of a large village and burial sites from the

7 pre-contact era through the 1930s.  (*Id.* ¶ 158.)  The village site, located on USFS land, was

8 disrupted by the construction of the first Antler's Bridge in the 1940s and railroad tracks built in

9 decades prior.  (*Id.* ¶¶ 158, 161.)  The development and related flooding of the Shasta Dam

10 Reservoir required the hasty removal of many burial sites, though only remains identified by

11 name were exhumed. (*Id.* ¶¶ 158, 165.)  Human remains have been found at the site as late as the

12 1980s, and other archaeological artifacts were discovered in 2010.  (*Id.* ¶ 158.)

13    The Antler's Bridge project is a bridge realignment project built in coordination

14 with the USFS, the Bureau of Reclamation and CalTrans.  (*Id.* ¶¶ 159, 166.)  Plaintiffs allege that

15 in 2010, the USFS failed to proactively manage the project by leaving project management to

16 CalTrans staff, who allowed stone artifacts and obsidian points to be removed from the site and

17 placed outside the project area.  (*Id.* ¶ 160.)  The USFS also failed to exercise appropriate

18 responsibility by allowing CalTrans to violate its Memorandum of Understanding (MOU) with

19 the Tribe by: (1) allowing ground disturbance without personnel on hand; (2) not preparing an

20 archaeological survey before using an auger to bore through the midden layer; and (3) not

21 preparing surveys, drawings, photographs, measurements, a side wall feature description, or

22 determine the depth and breadth of the midden layer.  (*Id.* ¶ 161.)  The USFS failed to preserve

23 the midden material to determine if human remains could be found, and retained artifacts

24 recovered from the site without a record or plan.  (*Id.* ¶ 162.)  The USFS is refusing to disclose

25 the disposition of these artifacts.  (*Id.*)  The USFS determined that the bridge site was not a major

26 historic and archaeological site.  (*Id.* ¶ 168.)  Plaintiffs claim the USFS violated ARPA by

1   "failing to act proactively during the initial site management phase" (*id.* ¶ 160), by failing to

2   preserve and disclose discovered archaeological resources (*id.* ¶ 162), and continuing to allow

3   the destruction of resources at the site.  (*Id.* ¶ 163.)  Plaintiffs also claim that defendants violated

4   NHPA when they determined the site was not a major historical site, by failing to perform

5   consultation with parties interested in preserving its historic resources and by failing to formulate

6   a preservation plan.  (*Id.* ¶¶ 167–169.)

7           H.      Cemetery Land in Trust (Claims 8 & 9)

8                   Prior to the construction of the Shasta Dam Reservoir, the Tribe controlled

9   numerous tribal lands, cemeteries, and Indian trust allotments in the watershed of the McCloud

10   River.  (*Id.* ¶¶ 173–174.)  In 1941, Public Law 77–198 authorized the Secretary of the Interior to

11   relocate Indian cemeteries expected to be flooded by the Shasta Dam Reservoir, and the United

12   States was to hold the new cemetery, the Shasta Reservoir Indian Cemetery (Cemetery), in trust

13   for the appropriate tribe or family.  (*Id.* ¶ 172.)  From 1937 to 1941, twenty-six tribal cemetery

14   sites were relocated to the Cemetery, in Shasta Lake City, California.  (*Id.* ¶ 176.)  Tribe

15   members assisted in preparing documentation and identifying these burial areas by providing

16   names, birth dates, and family relationships of the 183 people re-interred at the new Cemetery.

17   (*Id.*)  Tribe members also helped establish the present day layout of the cemetery plots, which

18   included burials from the early 1800s to 1941, using tribal principles from the villages on the

19   McCloud River.  (*Id.* ¶¶ 176–177.)  The plots are reserved for Tribe members only.  (*Id.* ¶ 189.)

20                   In a letter to the Tribe dated April 13, 2004, from the Assistant General Solicitor

21   of the DOI, DOI acknowledged that Public Law 77–198 gave responsibility to the DOI to care

22   for Indian cemeteries relocated at the direction of Congress.  (*Id.* ¶ 180.)  The Tribe followed up

23   on May 7, 2004 with a letter to the State Director of the BLM, an agency within the DOI, asking

24   the BLM to acknowledge that title to the Cemetery is held in Indian trust status, with beneficial

25   title vested in the Tribe.  (*Id.* ¶ 181.)  In response, in a November 5, 2004, letter from the

26   Regional Solicitor for the DOI, the DOI stated that it refused to acknowledge that the Cemetery

1  is held in Indian trust status for the benefit of the Tribe.  (*Id.* ¶ 182.) Plaintiffs seek declaratory

2  relief that the cemetery is held in trust for their tribal members.

3          In addition, the BLM has allowed the Cemetery to be used by non-tribe members,

4  including in an instance where an individual was buried on top of an existing grave holding a

5  Tribe member's remains.  (*Id.* ¶ 189.)  Plaintiffs also claim that the BLM and USFS have

6  allowed degradation of the area by admitting members of the general public in violation of

7  ARPA.  (*Id.*)

8  III.    LEGAL STANDARD

9          Defendants move to dismiss plaintiffs' Second Amended Complaint under Rule

10  12(b)(1) for lack of jurisdiction over certain claims and under Rule 12(b)(6) for failure to state

11  certain claims.

12          A.    Subject Matter Jurisdiction

13          Federal courts are courts of limited jurisdiction and, until proven otherwise, cases

14  lie outside the jurisdiction of the court.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511

15  U.S. 375, 377–78 (1994).   Lack of subject matter jurisdiction may be challenged by either party

16  or raised *sua sponte* by the court.  FED. R. CIV. P. 12(b)(1); FED. R. CIV. P. 12(h)(3); *see also*

17  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1983). A Rule 12(b)(1) jurisdictional

18  attack may be either facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a

19  facial attack, the complaint is challenged as failing to establish federal jurisdiction, even

20  assuming all the allegations are true and construing the complaint in the light most favorable to

21  plaintiff.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

22          By contrast, in a factual attack, the challenger provides evidence that an alleged

23  fact is false resulting in a lack of subject matter jurisdiction.  *Id.*  In these circumstances, the

24  allegations are not presumed to be true and "the district court is not restricted to the face of the

25  pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual

26  disputes concerning the existence of jurisdiction."  *McCarthy v. United States*, 850 F.2d 558, 560

(9th Cir. 1988).  "Once the moving party has converted the motion to dismiss into a factual

motion by presenting affidavits or other evidence properly brought before the court, the party

opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of

establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036,

1039 n.2 (9th Cir. 2003).

Jurisdictional dismissal is "exceptional" and warranted only "'where the alleged

claim under the constitution or federal statutes clearly appears to be immaterial and made solely

for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and

frivolous.'"  *Safe Air for Everyone*, 373 F.3d at 1039 (quoting *Bell v. Hood*, 327 U.S. 678,

682–83 (1948)).  Accordingly, the Ninth Circuit has held that "[j]urisdictional finding of

genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are

so intertwined that the question of jurisdiction is dependent on the resolution of factual issues

going to the merits of an action.'"  *See Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711

F.2d 138, 139 (9th Cir. 1983) (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.

1983)).  "Normally, the question of jurisdiction and the merits of an action will be considered

intertwined where . . . a statute provides the basis for both the subject matter jurisdiction of the

federal court and the plaintiff's substantive claim for relief." *Id*. (quotation omitted).

Plaintiffs argue that because the elements of the underlying claims are intertwined

with the question of subject matter jurisdiction, the court is barred from examining extrinsic

evidence to dispose of the claims on a Rule 12(b)(1) motion.  (Opp'n at 2–3, ECF 62.)

Defendants suggest that because this is the third motion to dismiss, and this is the first time

plaintiffs have raised this argument, it should be considered waived or plaintiffs should be

estopped from raising it. (Reply at 1–2, ECF 66.)  Defendants do not provide legal support for

the application of estoppel or waiver.   The court declines their suggestion.[3]

---

[3] Moreover, it is doubtful that either doctrine applies.  Judicial estoppel applies where a
party assumes a position that is clearly inconsistent with an earlier position that they persuaded

1          In *Roberts v. Corothers*, the Ninth Circuit explained:

2          Ordinarily, where a jurisdictional issue is separable from the merits
           of a case, the court may determine jurisdiction by the standards of
3          a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. In such a
           situation, the district court is: "free to hear evidence regarding
4          jurisdiction and to rule on that issue prior to trial, resolving factual
           disputes where necessary." . . . The relatively expansive standards
5          of a 12(b)(1) motion are not appropriate for determining
           jurisdiction in a case like this, where issues of jurisdiction and
6          substance are intertwined.  A court may not resolve genuinely
           disputed facts where "the question of jurisdiction is dependent on
7          the resolution of factual issues going to the merits."

8   812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *Augustine*, 704 F.2d at 1077).  Defendants cite to

9   *Miccosukee Tribe of Indians of Florida v. United States*, 650 F. Supp. 2d. 1235, 1238 (S.D. Fla.

10  2009), for the proposition that where a plaintiff brings a claim under the APA based on a

11  violation of a separate statutory scheme, jurisdiction and merits are not intertwined and the court

12  can resolve factual disputes at the pleading stage.  *Miccosukee* concluded in a cursory footnote

13  that "because the bases for the Court's subject matter jurisdiction and Plaintiff's substantive

14  claim—the APA and NEPA/FACA, respectively—are different, the Court is satisfied that

15  jurisdiction here is not intertwined with the merits of the cause of action." *Id*. at 1239 n.2.  This

16  court disagrees that the same conclusion can be reached here.[4]

17  _____

18  the court to adopt to their advantage. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).
    Here, there is no basis to apply estoppel. Waiver, by comparison, is generally applied where a
19  party fails to raise an argument during the appropriate phase of litigation.  This action has never
    proceeded past defendants' motions to dismiss.  *See GCB Commc'ns, Inc. v. U.S. South
20  Commc'ns*, Inc., 650 F.3d 1257, 1262 (9th Cir. 2011) (arguments not raised before district court
    are waived on appeal); *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (argument waived
21  where it was raised for the first time in the reply brief); *United States v. Gomez–Norena*, 908
    F.2d 497, 500 (9th Cir. 1990) (failing to object at trial waives evidentiary objection).
22  Defendants' waiver argument itself may now be waived because they have failed to provide
    support for it.  *See F.D.I.C. v. Garner*, 126 F.3d 1138, 1145 (9th Cir. 1997) (holding an argument
23  waived where the party provided "no case law or argument in support of [its] claim").

24       [4] It bears clarifying the court's jurisdictional basis over plaintiffs' claims.  The APA does
    not provide a basis for subject matter jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 104–05
25  (1977). Rather, subject matter jurisdiction is conferred by the presence of a federal question. *See*
    28 U.S.C. § 1331; *Gallo Cattle Co. v. U.S. Dept. of Agriculture*, 159 F.3d 1194, 1198 (9th Cir.
26  1999). Separate and apart from Section 1331's grant of subject matter jurisdiction, the APA
    provides a waiver of sovereign immunity for federal agency actions, 5 U.S.C. § 702, which is a

It is well established that federal subject matter jurisdiction and the merits are intertwined when the same statute provides both the basis for subject matter jurisdiction and the cause of action.  *See Sun Valley Gasoline,* 711 F.2d at 139; *Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*, 549 F.2d 597, 602 (9th Cir. 1976), *superseded by statute, McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988).  In *Timberlane*, the court observed "it seems settled that, when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous."  549 F.2d at 602.  Later, in *Sun Valley*, the court cited *Timberlane* by way of example, and not limitation, for the proposition that resolution of disputed facts on a Rule 12(b)(1) motion is inappropriate where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." 711 F.2d at 139–140.  Even if the rule is clear for cases where the claim and jurisdiction fall under the same statute,[5] it does not follow that where jurisdiction is conferred by a separate

_____

"prerequisite for jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *see Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1016 (9th Cir. 2007) ("To confer subject matter jurisdiction in an action against a sovereign, in addition to a waiver of sovereign immunity, there must be statutory authority vesting a district court with subject matter jurisdiction."). Defendants essentially premise their Rule 12(b)(1) attack on the limits to the APA's waiver of sovereign immunity under the APA, because they challenge the facts that would support finding a final agency action.  *See Gallo Cattle*, 159 F.3d at 1199 (court lacked jurisdiction because there was no final agency action); *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("Absent final agency action, there was no jurisdiction in the district court to review the NEPA claim"); *but see Sierra Club v. Jackson*, 648 F.3d 848, 853–54 (D.C. Cir. 2011) (noting that final agency action is not a jurisdictional issue, and challenges based on final agency action should be analyzed under Rule 12(b)(6)).

[5] This maxim is more frequently cited for the rule that where a jurisdictional attack is mounted against a claim that implicates statutory interpretation, the court should refrain from dismissing where an interpretation is available that supports jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) ("[T]he district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.'" (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)); *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008); *see also Leeson v. Transamerica*

statute, the claim and jurisdiction are not intertwined.  Defendants' proposed rule would allow

factual attacks on any claims based on the court's federal question jurisdiction at the pleading

stage even where those claims are neither frivolous nor pled simply to obtain federal subject

matter jurisdiction.  Here, defendants rely on declarations by parties plaintiffs have not had the

opportunity to depose, which in turn rely on research currently unavailable to plaintiffs.   (*See*

ECF 56–1 at 8–11.)  The factual disputes go to the merits of the action because the claims rise or

fall on the disputed presence of archaeological resources, whether a site is eligible for the

National Register, whether environmental evaluations were completed, and whether defendants

properly consulted with plaintiffs regarding the subject sites.  A determination of disputed facts

on defendants' Rule 12(b)(1) motion thus would be improper.  *See Wells Fargo & Co. v. Wells*

*Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (suggesting that courts should allow

jurisdictional discovery when "pertinent facts bearing on the question of jurisdiction are

controverted . . . or where a more satisfactory showing of the facts is necessary." (quoting

*Kilpatrick v. Texas & P. Ry.*, 72 F. Supp. 635, 638 (S.D.N.Y. 1947)); *Friends of the River v. U.S.*

*Army Corps of Engineers*, No. 2:11–CV–01650 JAM–JFM, 2012 WL 1552623, at *5 (E.D. Cal.

April 27, 2012) (declining to examine extrinsic evidence on a Rule 12(b)(1) factual attack

directed to APA claims because the information submitted was possessed solely by defendants,

went to merits, and constituted an incomplete administrative record).

       Defendants also argue that, even if the court determines that the merits and

jurisdiction are intertwined, the court can proceed to evaluate the motion under the summary

judgment standard of Rule 56.  *Augustine v. United States*, 704 F.2d at 1077 (citing *Thornhill*

*Publishing Co. v. General Telephone Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).

Plaintiffs, however, have articulated the equivalent of a Rule 56(d) objection, saying they need

*Disability Income Plan*, 671 F.3d 969, 974–75 (9th Cir. 2012) (holding that district court
improperly construed a statute to dismiss for lack of jurisdiction when it required interpretation
of whether plaintiff was a plan participant).

1   time for discovery in order to properly oppose the motion.  A Rule 56 analysis is not appropriate

2   at this time.

3           The court declines to resolve disputed facts and instead assumes the truth of the

4   allegations in the Second Amended Complaint.

5           B.      Failure to State a Claim

6           Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

7   dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

8   dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

9   under a cognizable legal theory."  *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699

10  (9th Cir. 1990).

11          Although a complaint need contain only "a short and plain statement of the claim

12  showing that the pleader is entitled to relief," (FED. R. CIV. P. 8(a)(2)), in order to survive a

13  motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to

14  'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

15  (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must

16  include something more than "an unadorned, the–defendant–unlawfully–harmed–me accusation"

17  or "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action.'"

18  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint

19  will survive a motion to dismiss for failure to state a claim is a "context-specific task that

20  requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556

21  U.S. at 679.  Ultimately, the inquiry focuses on the interplay between the factual allegations of

22  the complaint and the dispositive issues of law in the action.  *See Hishon v. King & Spalding*,

23  467 U.S. 69, 73 (1984).

24          In making this context-specific evaluation, this court must construe the complaint

25  in the light most favorable to the plaintiff and accept as true the factual allegations of the

26  complaint.  *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  This rule does not apply to "'a legal

1   conclusion couched as a factual allegation,'" (*Papasan v. Allain*, 478 U.S. 265, 286 (1986)

2   (quoted in *Twombly*, 550 U.S. at 555)), nor to "allegations that contradict matters properly

3   subject to judicial notice" or to material attached to or incorporated by reference into the

4   complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir. 2001).  A court's

5   consideration of documents attached to a complaint or incorporated by reference or as a matter of

6   judicial notice will not convert a motion to dismiss into a motion for summary judgment.  *United*

7   *States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003); *Parks School of Business v. Symington*,

8   51 F.3d 1480, 1484 (9th Cir. 1995); *cf. Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002)

9   (noting that even though court may look beyond pleadings on motion to dismiss, generally court

10  is limited to face of the complaint on 12(b)(6) motion).

11  IV.   <u>ANALYSIS</u>

12           Defendants frame their jurisdictional attack on plaintiffs' claims by arguing that

13  the statutes identified by plaintiffs do not apply to the sites, therefore plaintiffs do not have

14  prudential standing because they cannot identify a required final agency action defendants failed

15  to take.  (*See, e.g.*, ECF 56 at 2:20, 3:10, 4:27-28, 5:10, 6:6-9, 9:7-8.)  In order to establish

16  prudential standing with respect to each APA claim, plaintiffs must allege a final agency action

17  that injures asserted interests that are "arguably within the zone of interests to be protected or

18  regulated by the statute" under which they are proceeding.  *See* 5 U.S. C. § 702;  *Ass'n of Data*

19  *Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).[6]  Plaintiffs' claims generally

20  attack agency inaction where plaintiffs allege action was required.

21  _____

22           [6] The court previously has held that plaintiffs are within the "zone of interests" of the
    NHPA. (*See* ECF 24). NHPA, ARPA and  NEPA each embrace the public's interest in
23  preserving historic, archaeological and environmental resources, respectively, and, as such,
    plaintiffs here fall within each regime's "zone of interests." *See* 36 C.F.R. § 800.2(d)(1)-(2);
24  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011); *Presidio Golf*
    *Club v. National Park Service*, 155 F.3d 1153, 1158–59 (9th Cir. 1998) ("[T]he Club's interests
25  in maintaining its historic Clubhouse and the surrounding environment in a fashion suitable for
    the game of golf, are arguably within the zones of interests to be protected by NEPA and
26  NHPA."). Moreover, defendants do not appear to seriously challenge plaintiffs' prudential
    standing under the statutes, assuming the facts they allege are taken as true.

1    　　　　The APA defines "agency action" to include both affirmative acts such as issuing

2    or denying "an agency rule, order, license, sanction [or] relief" as well as an agency's "failure to

3    act." 5 U.S.C. § 551(13).  Agency inaction is reviewable under the APA in two instances:

4    (1) where "agency action [has been] unlawfully withheld or unreasonably delayed," 5 U.S.C.

5    § 706(1); and (2) where agency inaction has the same effect as an agency action.  *See Northcoast*

6    *Environmental Center v. Glickman,* 136 F.3d 660, 665 (9th Cir. 1998) (failure to abide by NEPA

7    requirements could constitute failure to act under Section 706(2)); *Alliance to Save the*

8    *Mattaponi, et al. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 10 (D.C. Cir. 2007) (holding

9    the court had jurisdiction under 5 U.S.C. § 706(2) where agency "wrongly failed to exercise

10   discretion in [plaintiffs'] favor," which  failure the "APA views as final, notwithstanding the fact

11   that the agency 'did' nothing'").

12   　　　　An agency decision to act or not to act is entitled to significant deference.

13   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990) (a claimant "cannot demand general

14   judicial review . . . of day–to–day operations").  Indeed, inaction is unreviewable when such

15   decisions have "traditionally 'been committed to agency discretion.'"  *Heckler v. Chaney*, 470

16   U.S. 821, 832 (1985) (construing 5 U.S.C. § 701(a)(2)); *Pinnacle Armor, Inc. v. United States*,

17   648 F.3d 708, 718–19 (9th Cir. 2011) (explaining that this bar applies only in rare instances

18   where a statute is drawn so broadly such that there is no legal standard by which to measure the

19   agencies' exercise of discretion.).

20   　　　A.　　Archaeological Resources Protection Act

21   　　　　Plaintiffs aver in their first through seventh and ninth claims that defendants are

22   liable for their inaction in preventing incidental  harm to archaeological resources at Nosoni

23   Creek, Dekkas, Coonrod Flat, Buck Saddle, Panther Meadow, Rocky Ridge and Antler's Bridge.

24   Plaintiffs say the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa, *et*

25   *seq.*, requires defendants' proactive prevention of harm to such resources.  Under

26   ARPA,"'Archaeological Resource' means any material remains of human life or activities which

are at least 100 years of age, and which are of archaeological interest." 43 C.F.R. § 7.3(a).

Otherwise naturally occurring objects or organic matter may constitute an archaeological

resource where they evince human involvement. *See* 43 C.F.R. § 7.3(a)(3)(I), (4)(ii)

(archaeological resources includes "rock alignments" and "horticultural/agricultural gardens or

fields" while it excludes "unworked minerals and rocks").  ARPA provides that "[n]o person

may excavate, remove, damage or otherwise alter or deface" an archaeological resource located

on public or Indian lands unless the person has a permit for such activity. 16 U.S.C. § 470ee(a).

The statute applies to the U.S. government and its agents. *See* 43 C.F.R. § 7.3(g).

In order to obtain an ARPA permit, one must satisfy the Federal land manager

that the "activity is undertaken for the purpose of furthering archaeological knowledge in the

public interest." 16 U.S.C. § 470cc(b)(2). The findings section of ARPA sets forth Congress's

intent to prevent "uncontrolled excavations and pillage" and to facilitate orderly access to

archeological sites by professionals. *See* 16 U.S.C. § 470aa.  ARPA and its implementing

regulations establish a permitting regime to allow those focused on archaeological resources to

maintain access to those resources on federal land.  However, "[n]o ARPA permit is required to

conduct activities on public lands when those activities are entirely for purposes other than the

excavation or removal of archaeological resources." *San Carlos Apache Tribe v. United States*,

272 F. Supp. 2d 860, 888 (D. Ariz. 2003); *Attakai v. United States*, 746 F. Supp. 1395, 1410–11

(D. Ariz.1990) (dismissing ARPA claims where no purposeful activities aimed at archaeological

resources were alleged).  ARPA itself clarifies that "nothing in this chapter shall be construed to

repeal, modify, or impose additional restrictions on the activities permitted under existing laws

/////

/////

/////

/////

/////

and authorities relating to mining, mineral leasing, reclamation, and other multiple uses of the

public lands." 16 U.S.C. § 470kk. The applicable permitting regulation makes this point as well:

> No permit shall be required under this part for any person
> conducting activities on the public lands under other permits,
> leases, licenses, or entitlements for use, when those activities are
> exclusively for purposes other than the excavation and/or removal
> of archaeological resources, even though those activities might
> incidentally result in the disturbance of archaeological resources.
> General earth-moving excavation conducted under a permit or
> other authorization shall not be construed to mean excavation
> and/or removal as used in this part.

43 C.F.R. § 7.5(b)(1).

Here, the complaint does not allege intentional disturbance of archaeological

resources.[7] Rather, in each instance, plaintiffs at most allege degradation of archaeological

resources as an incidental effect, or externality from some other activity. Plaintiffs were aware of

this potential defect, as the court previously identified this issue. *See Winnemem Wintu Tribe v.*

*U.S. Dept. of Interior*, 725 F. Supp. 2d 1119, 1137 n.8 (E.D. Cal. 2010).  Plaintiffs do not

address defendants' argument in their opposition brief.

In only one instance do the allegations appear to come close to stating a claim

under ARPA.  At Antler's Bridge, plaintiffs allege "the USFS has retained possession of artifacts

recovered from the site without plan or record as required by ARPA and refuses to disclose the

---

[7] One paragraph related to the Cemetery ARPA claim vaguely suggests some intentional activity. In paragraph 189 of the SAC, plaintiffs allege "[i]n one instance, a non-Wintu individual was buried on top of one of an existing grave *[sic]* holding a Winnemem Wintu Tribal member." First, this allegation does not indicate that someone intentionally disturbed existing archaeological resources, but rather buried another individual on top of existing resources. Second, and more importantly, the court has cautioned plaintiffs that their pleadings must comply with Rule 8; this allegation is too vague to warrant denying defendants' motion to dismiss. *See* note 2 *supra*. In addition, allowing amendment here would prejudice defendants DOI, BOR, BIA, BLM and USDA who would be required to remain in the litigation to defend a claim that plaintiffs have repeatedly failed to allege so as to avoid dismissal. *See Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc*., 637 F.3d 1047, 1058–59 (9th Cir. 2011) (upholding dismissal with prejudice of prolix pleading as prejudicial to defendants); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989) (holding defendants were prejudiced by having to continue litigation of  a claim where "a more careful reading of [the statute] would have avoided" the pleading deficiencies).

1  disposition of these items to the Winnemem Wintu Tribe." (SAC ¶ 162.)  As pleaded, the activity

2  leading to discovery of the artifacts falls under an ARPA exclusion because it was in conjunction

3  with a separately authorized project that was not directed to unearthing archaeological resources.

4  Plaintiffs do not articulate the importance or relevance of the Memorandum of Understanding

5  with CalTrans or why USFS should be responsible for the actions of a third party. (*See* SAC

6  ¶¶ 157–164.)  While the allegations are not tethered to a legal basis for relief, the SAC is the first

7  opportunity plaintiffs have had to allege this claim. They should be granted leave to amend.

8  Defendants' motion to dismiss plaintiffs' ARPA claims is granted without leave to amend,

9  except with respect to the ARPA claim as to Antler's Bridge for which leave to amend is

10  granted.

11          B.      National Historic Preservation Act

12          Plaintiffs' first through seventh claims are also brought under the National

13  Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, *et seq*., which ensures that prior to any

14  significant action undertaken or approved by the federal government, local constituents and other

15  interested parties are consulted as a means to preserve important historical and cultural

16  resources. *See* 16 U.S.C. § 470(b).  "Under NHPA, it is the policy of the federal government to

17  'foster conditions under which our modern society and our prehistoric and historic resources can

18  exist in productive harmony and fulfill the social, economic, and other requirements of present

19  and future generations.'" *Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000) (quoting 16

20  U.S.C. § 470-1(1)).  "[T]he fundamental purpose of the NHPA is to ensure the preservation of

21  historical resources." *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*,

22  608 F.3d 592, 609 (9th Cir. 2010).  Toward that end, Section 106 of NHPA requires a federal

23  agency in charge of an undertaking where federal funds will be expended  to "take into account

24  the effect of [an] undertaking on any district, site, building, structure, or object that is included in

25  or eligible for inclusion in the National Register [of Historic Places]."  16 U.S.C. § 470f.

26  "Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal agency to

consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). Federal agencies must comply with the Advisory Council on Historic Preservation's regulations implementing section 106. *See* 16 U.S.C. § 470s; *Attakai*, 746 F. Supp. at 1405. In *Muckleshoot*, the court summarized the obligations imposed by the NHPA:

> Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c). The Forest Service must confer with the State Historic Preservation Officer [] and seek the approval of the Advisory Council on Historic Preservation[].

*Muckleshoot Indian Tribe*, 177 F.3d at 805. Additional provisions, not applicable here, apply to federally recognized Indian tribes. *See* 16 U.S.C. § 470a(d)(6); 36 C.F.R. § 800.2(c)(2)(ii)(A). The Ninth Circuit has noted that NHPA is a procedural statute. *See Te–Moak Tribe*, 608 F.3d at 610.

Section 110 was added to the NHPA in 1980, to "clarif[y] and codif[y] the minimum responsibilities expected of Federal agencies in carrying out the purposes of [NHPA]." *Lee v. Thornburgh*, 877 F.2d 1053, 1057 (D.C. Cir. 1989) (quoting H.R.Rep. No. 1457, 96th Cong., 2d Sess. 36 (1980), reprinted in 1980 U.S.C.C.A.N. 6378, 6399). Section 110 provides in relevant part:

> The heads of all Federal agencies shall assume responsibility for the preservation of historic properties which are owned or controlled by such agency. . . Each Federal agency shall establish [], in consultation with the Secretary, a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties.

16 U.S.C. § 470h–2(a) –(b). Courts that have addressed Section 110 have held that it does not create substantive obligations, apart from the procedural obligations already present in the Section 106 process. *See Lee*, 877 F.2d at 1058 (NHPA "is a narrow statute. Its main thrust is to

encourage preservation of historic sites and buildings rather than to mandate it."); *Nat'l Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996) ("Section 110 was not intended to create new substantive preservationist obligations"); *Wilderness Watch v. Iwamoto*, No. C10–1797–JCC, 2012 WL 1072064, at *7–8  (W.D. Wash. March 27, 2012) (observing the lack of guidance from the Ninth Circuit on Section 110 and holding it does not create substantive preservationist duties).  However, Section 110 "on its face appears more outcome-oriented than § 106," *id.*, and  on that basis, plaintiffs argue it creates affirmative preservationist obligations for the USFS to formulate protection plans on a site by site basis. Defendants argue that even if Section 110 creates affirmative obligations, it does not do so on a site by site basis.

For each of the sites discussed below, plaintiffs allege that defendant USFS failed to act in accordance with its obligations under the NHPA, specifically Sections 106 and 110. When making claims for a "failure to act," a plaintiff must show that "an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).  A required act is one "in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility." *ONRC Action v. BLM*, 150 F.3d 1132, 1137 (9th Cir. 1998) (quoting *Pub. Citizen Health Research Group v. Comm'r, Food and Drug Admin.*, 740 F.2d 21, 32 (D.C. Cir. 1984)).

### 1.     Nosoni Creek

Plaintiffs complain USFS approved  a 2000 bridge project and subsequent truck ramp project at Nosoni Creek, a historical site, without engaging in the consultation process required by NHPA.  (SAC ¶¶ 77–79.)  Defendants argue that plaintiffs' claims are barred by the six-year statute of limitations applicable to APA claims.  *See* 28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 712–13 (9th Cir. 1991).  The primary activity at Nosoni Creek that plaintiffs complain of occurred from 2000 through 2002.  In the court's previous order, plaintiffs were put on notice that their Nosoni Creek claims appeared time–barred.  *Winnemem Wintu Tribe*, 725 F. Supp. 2d at 1137.  Plaintiffs suggest their claims

are entitled to equitable tolling.  "Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss . . . if equitable tolling is at issue." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003–04 (9th Cir. 2006).  In this circuit, "'[a] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).  Here, plaintiffs allege they petitioned the USFS regarding the bridge project and truck ramp at the Nosoni Creek site.  (SAC ¶¶ 77, 79, 80.)  They also allege that throughout implementation of both projects they have sought consultation with defendants.  (*Id.*)  Construed liberally, plaintiffs have pleaded a sufficient basis from which they could develop an equitable tolling defense.

Defendants also argue their evidentiary submissions show definitively that Nosoni Creek is not eligible for the National Register and that the government did comply with NHPA.  (Motion at 4.)  But as discussed above, the court does not examine defendants' evidentiary submissions at this phase of the litigation.  The SAC alleges that defendants failed to identify Nosoni Bridge as a historic site, failed to undertake a Section 106 process in conjunction with federal undertakings at a site eligible for the National Register, and failed to confer with interested parties.  Plaintiffs allege these failures have led to degradation of the site and that the USFS failed to avoid or mitigate adverse effects.  Construing the complaint in plaintiffs' favor as required, the court finds the SAC adequately states a claim for a violation of NHPA based on the bridge project and truck ramp at Nosoni Creek.  Defendants' motion to dismiss plaintiffs' Nosoni Creek NHPA claim is denied.

2.      Dekkas Site

Plaintiffs allege that the USFS violated Section 106 of the NHPA by failing to engage in meaningful consultation as required by 36 C.F.R. § 800.2 (a)(4) in connection with the Gilman Road Shaded Fuelbreak project.  (SAC ¶ 98.)  The SAC also alleges that the USFS

1 violated its Programmatic Agreements developed under Section 106 by: (1) cutting and

2 destroying cultural resources; (2) failing to include an accurate report on the destruction of the

3 manzanita in annual reports; (3) failing to monitor project activities; (4) failing to make annual

4 reports available to the public; and (5) failing to comply with public participation requirements.

5 (*Id.* ¶ 99.) The USFS has ignored the Tribe's complaints about the fuelbreak project and failed

6 to protect areas identified in the project protection plan. (*Id.* ¶ 101.)

7       Defendants argue this claim is time–barred because their evidence shows the last

8 federal undertaking occurred in 2005, beyond the six–year statute of limitations. In addition,

9 defendants argue that the claim is vague and conclusory. (Motion at 6–7; Reply 4–5.) While

10 plaintiffs' pleading could be more clear, the court finds the claim sufficient to survive a motion

11 to dismiss. Plaintiffs' identification of alleged failures to meet with interested parties and

12 violations of the agency's programmatic agreement is definite enough for defendants to respond

13 to. Defendants' motion to dismiss plaintiffs' Gilman Road NHPA claim is denied.

14       Plaintiffs also complain in connection with the NHPA that they have been denied

15 an exclusive use permit for the Dekkas Site. (SAC ¶ 102.) The complaint does not explain why

16 a permit should be awarded for Dekkas under NHPA or any other law. Because plaintiffs have

17 not identified a duty by defendants to issue a permit, this claim premised on the USFS's failure

18 to act necessarily fails. *See Confederated Tribes of the Umatilla Indian Reservation v.*

19 *Bonneville Power Admin.*, 342 F.3d 924, 929 (9th Cir. 2003) (dispensing with any further

20 analysis of the claim of an 'unreasonable delay' because no statutory duty could be found); *N.*

21 *Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 747 (9th Cir. 2009) (ceasing analysis of

22 failure to act claim after finding no enforceable obligation existed). Moreover, amendment

23 would be futile. Defendants' motion to dismiss plaintiffs' permitting claim is granted without

24 leave to amend.

25 /////

26 /////

1        3.      Coonrod Flat Cultural Site

2        Plaintiffs allege that defendants also have violated NHPA because they have

3  failed to protect Coonrod Flat, a site listed on the National Register.  (SAC ¶¶ 109–110.)

4  Defendants argue that plaintiffs fail to challenge any final agency action, and also do not identify

5  any undertaking and therefore no triggering event for a Section 106 process.  Plaintiffs' specific

6  allegation is that defendants have granted a permit to graze cattle on 5,000 acres of land on the

7  site; prior to granting the permit, a Section 106 process should have been completed.

8  Defendants' averment that no such permit ever issued raises a question for resolution later in the

9  case, following discovery.  If, as plaintiffs contend, the USFS granted a cattle–grazing permit on

10  a protected site without engaging in the required procedures, plaintiffs can properly challenge

11  that as a final agency action.  Defendants' motion to dismiss plaintiffs' Coonrod Flat NHPA

12  claim is denied.

13        4.      Buck Saddle Prayer Site

14        The court previously has held that plaintiffs' claim of a NHPA violation with

15  respect to the Buck Saddle Prayer site survived defendants' motion to dismiss.  (ECF 51 at 37.)

16  Defendants do not provide any reasons for the court to reconsider the prior order.  Defendants'

17  motion to dismiss in this respect is denied.

18        5.      Panther Meadow

19        Panther Meadow is listed on the National Register.  Plaintiffs claim the volume of

20  tourist visitation is causing significant damage to important resources at the site including by

21  contaminating the spring with foreign objects, trampling vegetation, and degradation of the

22  spring.  Plaintiffs complain the USFS has failed to adequately protect the meadow through

23  development of a protective plan, as required by Section 110 of the NHPA.  Plaintiffs misread

24  the applicable law.  Section 110 requires each agency to implement a protection plan to apply to

25  projects and lands under its control, but it does not require site–by–site planning.  *See* 16 U.S.C.

26  /////

§ 470h.  Amendment would be futile.  Defendants' motion to dismiss plaintiffs' NHPA claim

regarding Panther Meadows is granted without leave to amend.

     6.  Rocky Ridge

     Plaintiffs allege that Rocky Ridge is a historic site eligible for the National

Register due to its age and association with tribal history. With the tacit approval of USFS, the

Jones Valley resort uses the site as an overflow parking lot.  Plaintiffs complain that the USFS

has not completed the Section 106 process required by the NHPA and Advisory Council

regulations to avoid, minimize, or mitigate the adverse effects.  (SAC ¶ 153.)  While defendants

aver that no parking lot project was ever approved, they do not contest plaintiffs' assertion that a

parking lot would trigger the Section 106 process.  Construing the complaint liberally in

plaintiffs' favor, plaintiffs have adequately alleged that the USFS failed to engage in a Section

106 process with respect to Jones Valley's use of Rocky Ridge as a parking lot.  Defendants'

motion to dismiss plaintiffs' Rocky Ridge NHPA claim is denied.

     7.  Antler's Bridge Site

     Plaintiffs allege that the Antler's Bridge site, located on USFS land, is a historic

site and embodies important archaeological resources.  They say the Antler's Bridge project is a

bridge realignment project built in coordination with the USFS, BOR, and CalTrans.  This claim

is somewhat different from the others in that the SAC alleges that USFS and BOR determined

that Antler's Bridge was not a historic site.  (SAC ¶ 168.)  The Section 106 Process is implicated

only after the USFS determines a site is eligible for the National Register. 16 U.S.C. § 470f.  The

SAC does not provide any basis to conclude that the NHPA's determination was an abuse of

discretion.  To the extent plaintiffs allege the USFS did not treat the site as a historic site, they

were not obligated to until that determination was made.  To the extent plaintiffs challenge

USFS's and BOL's determination that the site was not historic, that decision is committed to

agency discretion, 16 U.S.C. § 470h–2(a)(2)(A), and beyond the scope of judicial review.

5 U.S.C. § 701(a)(2).  Defendants' motion is granted with respect to this claim.

1      C.      National Environmental Policy Act

2              Plaintiffs' first and fourth claim each also rely on the National Environmental

3      Policy Act ("NEPA"), 42 U.S.C. §§ 4332, *et seq*., and allege the USFS's failure to perform

4      environmental analysis at Nosoni Creek and the Buck Saddle Prayer Site.  (SAC ¶¶ 82, 126.)

5      NEPA requires federal agencies to prepare an environmental impact statement (EIS) for any

6      "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

7      § 4332(2)(c).  Prior to preparing an EIS, an agency may prepare an Environmental Assessment

8      (EA), and if it determines no significant effect on the environment will result, it may decline to

9      prepare an EIS.  40 CFR §§ 1508.9(a), 1508.13.

10             1.      Nosoni Creek

11             Plaintiffs claim that construction of the truck ramp at Nosoni Creek, during which

12     trucks have been continuously spilling diesel onto the ground, constitutes a major federal action

13     requiring an EIS.  The SAC alleges that defendants have not analyzed the environmental effects

14     of the truck ramp as required.  (SAC ¶ 83.)  Defendants aver that no such project exists.

15     Plaintiffs' allegations are sufficient at the pleading stage.  Defendants' motion to dismiss

16     plaintiffs' Nosoni Creek NEPA claim is denied.

17             2.      Buck Saddle Prayer Site

18             Plaintiffs claim that no NEPA analysis was prepared for the Clikapudi Bike trail

19     and its component bike ramp built on the prayer rock at Buck Saddle.  (SAC ¶ 127.)  Defendants

20     aver they have complied with NEPA. The SAC alleges an action by USFS with a significant

21     impact on the environment for which no EIS or EA was prepared. Here again, this is sufficient at

22     the pleading stage.  Defendants' motion to dismiss plaintiffs' Buck Saddle NEPA claim is denied

23     D.      Declaratory Relief: Indian Cemetery

24             Plaintiffs seek a declaratory judgment that the Shasta Reservoir Indian Cemetery

25     be held in Indian trust status, with beneficial title vested in the Winnemem Wintu Tribe. (SAC

26     ¶¶ 171–185.)  The Cemetery plots are reserved for Tribe members only.  (*Id*. ¶ 189.)  In 1941,

1    Congress enacted Public Law No. 77-198, 55 Stat. 612 ("1941 Act"), which allowed for

2    acquisition of lands for the Central Valley Project. The 1941 Act, provides in relevant part:

3            As to any cemetery lands required for the project, the Secretary of
             the Interior is authorized, in his discretion, in lieu of requiring
4            payment therefor, to establish cemeteries on other lands that he
             may select and acquire for the purpose, and to the remove bodies,
5            markers and other appurtenances to the new sites. . . . All right,
             title, and interest of the Indians in the lands within any cemetery so
6            relocated shall terminate and the grant of title under this Act take
             effect as of the date the Secretary of the Interior authorizes the
7            relocation. Sites of the relocated cemeteries shall be held in trust
             by the United States for the appropriate tribe, or family, as the case
8            may be, and shall be nontaxable.

9    Public Law No. 77-198, 55 Stat. 612.  Plaintiffs seek relief under the Declaratory Judgment Act,

10   28 U.S.C. § 2201, to enforce rights bestowed by the 1941 Act.

11           "Before [the court] may exercise jurisdiction over any suit against the

12   government, [it] must have a clear statement from the United States waiving sovereign

13   immunity, together with a claim falling within the terms of the waiver." *Jachetta v. United*

14   *States*, 653 F.3d 898, 903 (9th Cir. 2010) (quotation omitted).  Suits against the United States

15   "must start from the [] assumption that no relief is available." *Tucson Airport Authority v.*

16   *General Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998).  In addition, the Declaratory

17   Judgment Act does not confer federal subject matter jurisdiction; therefore plaintiffs must rely

18   on some other jurisdictional source. *See Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158,

19   1161 (9th Cir. 2005). Although not entirely clear, it appears plaintiffs premise their right to

20   declaratory relief on the APA's general waiver of sovereign immunity coupled with 28 U.S.C.

21   §1331.  *See* SAC ¶ 184; *see supra* at 13 n.4.  "Section 1331 'merely provides that the district

22   court shall have original jurisdiction in all civil actions arising under the Constitution, laws or

23   treaties of the United States' and 'cannot by itself be construed as constituting a waiver of the

24   government's defense of sovereign immunity.'" *See Dunn & Black, P.S. v. United States*, 492

25   F.3d 1084, 1088 n.3 (9th Cir. 2007) (quoting *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458–59 (9th

26   Cir. 1985)).  As noted above, the APA does contain a waiver of sovereign immunity. 5 U.S.C. §

702.  Defendants argue jurisdiction premised on the APA fails here, because its waiver does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"; Congress has provided such a waiver in the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a.  *Id.* Plaintiffs do not respond to this argument.

Recently, the Supreme Court explained the intersection of the APA and QTA in *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, __ U.S. __ 132 S. Ct. 2199 (2012). In *Patchak*, the Court noted in a hypothetical that were a third–party plaintiff to seek to invalidate the United States' taking his property in trust for Indian land, his claim would be barred. *Id.* at 2205.  The Court explained:  "True, it fits within the APA's general waiver, but the QTA specifically authorizes quiet title actions (which this hypothetical suit is) *except when* they involve Indian lands (which this hypothetical suit does). In such a circumstance, a plaintiff cannot use the APA to end-run the QTA's limitations."  *Id.* (emphasis in original).  The Court in *Patchak* looked to the "universally understood" meaning of quiet title as denominating those "suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property.  *Patchak*, 132 S. Ct. at 2206.  The Court made this point abundantly clear: "Congress [] 'intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property.'  We repeat: 'adverse claimants,' meaning plaintiffs who themselves assert a claim to property antagonistic to the Federal Government's."  *Id.* at 2207.  The plaintiff in *Patchak* did not assert any right in the subject property and therefore the Court found the QTA inapplicable. By contrast, here, plaintiffs seek to bar access to the cemetery to non–Winnemem and to have the property declared rightfully theirs. This court lacks jurisdiction to hear such a claim.  Plaintiffs' claim for declaratory relief with respect to the Cemetery is dismissed with prejudice.

/////

/////

/////

V.      CONCLUSION

Accordingly, as set forth above, the court orders as follows:

1.      Defendants' motion to dismiss plaintiffs' ARPA claims as to Nosoni Creek, Dekkas, Coonrod Flat, Buck Saddle, Panther Meadow, Rocky Ridge and the Cemetery is granted without leave to amend;

2.      Defendants' motion to dismiss plaintiffs' ARPA claim as to Antler's Bridge is granted with leave to amend;

3.      Defendants' motion to dismiss plaintiffs' NHPA claims as to Nosoni Creek, Dekkas, Coonrod Flat, Buck Saddle, and Rocky Ridge is denied;

4.      Defendants' motion to dismiss plaintiffs' claims for the use permit at Dekkas and NHPA claim for Panther Meadow is granted without leave to amend;

5.      Defendants' motion to dismiss plaintiffs' NHPA claim as to Antler's Bridge is granted with leave to amend; and

6.      Defendants' motion to dismiss plaintiffs' NEPA claims as to Nosoni Creek and Buck Saddle is denied.

Plaintiffs are granted twenty–one (21) days to file an amended complaint in accordance with this order.  Plaintiffs are cautioned that they should amend the complaint to remove all superfluous and irrelevant material, and restate their claims as allowed here to comply with Federal Rule of Civil Procedure 8. Defendants are granted thirty (30) days from the date of service of plaintiffs' amended complaint to file an answer or a motion to dismiss addressing only those claims for which leave to amend has been granted here.

IT IS SO ORDERED.

DATED:  July 26, 2012.

_____
UNITED STATES DISTRICT JUDGE