1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   CALEEN SISK FRANCO, et al.,              No. 2:09-cv-01072-KJM-KJN

12                 Plaintiffs,

13         v.                                 ORDER

14   UNITED STATES FOREST SERVICE,

15                 Defendant.

16

17          Plaintiffs, the Winnemem Wintu Tribe (the "WWT") and its leaders, allege

18   defendant United States Forest Service ("USFS" or "Forest Service") violated federal laws

19   intended to protect and preserve religious and culturally significant sites.  Fourth Am. Compl.

20   (FAC, ECF No. 121).  The sites, located in the Shasta Lake and McCloud River area of

21   California, are: 1) Nosoni Creek; 2) the Dekkas site; 3) Coonrod Flat; 4) Buck Saddle; 5) Rocky

22   Ridge; and 6) Antler's Bridge.  Under the Administrative Procedures Act ("APA"), 5 U.S.C.    §

23   701 *et seq.*, the WWT requests declaratory and injunctive relief to ensure defendant complies

24   with the statutory and regulatory requirements of the National Historic Preservation Act

25   ("NHPA"), 54 U.S.C. §§ 300101 *et seq.*, and National Environmental Policy Act ("NEPA"), 42

26   U.S.C. §§ 4321-4370.  The court held a hearing on the parties' cross-motions for summary

27   judgment on June 5, 2015, at which Courtney Bateman appeared for plaintiffs and Lynn Trinka

28

                                              1

1  Ernce appeared for defendant. As explained below, the court GRANTS in part and DENIES in

2  part each motion for summary judgment.

3  I.      BACKGROUND AND RECORD CONSIDERATIONS

4          A.      Procedural History

5                  Plaintiffs filed suit on April 19, 2009, naming several federal agencies and

6  individuals as defendants. Original Compl. ¶¶ 5–12, ECF No. 1. Several rounds of motion

7  practice have narrowed both the claims and defendants, *see* ECF Nos. 24, 51, 82, 120, and

8  plaintiffs filed the now-operative Fourth Amended Complaint on August 7, 2014, ECF No. 121.

9                  The USFS lodged the Administrative Record on November 20, 2013, Notice

10 Filing Administrative Record, ECF No. 105, and a corrected administrative record on November

11 27, 2013, Corrected Administrative Record, ECF No. 106. Plaintiffs filed a motion to compel the

12 completion of the Administrative Record on February 28, 2014. ECF No. 107. The court granted

13 the motion in part and denied it in part on July 24, 2014, and the USFS filed a Supplemental

14 Administrative Record on September 30, 2014. ECF No. 126.

15                 At the October 22, 2014 status conference, the parties agreed to resolve the matter

16 through cross-motions for summary judgment. ECF No. 129. The court set a briefing schedule

17 for the motions, and defendant USFS filed its motion for summary judgment on December 18,

18 2014. ECF No. 131. Plaintiffs filed an opposition and cross-motion on January 30, 2015, along

19 with a motion to strike certain exhibits from defendant's motion. ECF Nos. 133–134. Defendant

20 has filed an opposition. ECF No. 136. On March 13, 2015, plaintiffs filed a reply and a second

21 motion to strike. ECF Nos. 139, 140. On April 8, 2015, plaintiffs filed a notice of supplemental

22 authority, *Confederated Tribes & Bands of the Yakama Nation v. U.S. Fish & Wildlife Serv.*,

23 No. 14 -3052-TOR, 2015 WL 1276811 (E.D. Wash. Mar. 20, 2015). *See* ECF No. 144.

24         B.     Threshold Record Considerations

25                1.      Scope of Plaintiffs' Motions

26                As a threshold matter, the court considers defendant's argument that plaintiffs

27 have made arguments or raised claims in their motion for summary judgment that are not

28 encompassed by the Fourth Amended Complaint, and therefore the court should not consider

2

1    those aspect of plaintiffs' motion.  Opp'n at 1, 7, 11, 12, ECF No. 136.  When a claim is first

2    raised in the moving papers opposing summary judgment, it should in fact not be considered.  *See*

3    *Demarest v. Ocwen Loan Servicing, LLC*, 481 F. App'x 352, 353 (9th Cir. 2012); *389 Orange*

4    *St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).  A district court should not consider

5    such claims because "the complaint did not provide fair notice" of them.  *Gonzalez v. City of Fed.*

6    *Way*, 299 F. App'x 708, 710 (9th Cir. 2008).  This rule is not a rigid bar against considering

7    claims or arguments raised in opposing summary judgment when the complaint does give "fair

8    notice of what the plaintiffs' claim is and the grounds upon which it rests."  *Pickern v. Pier 1*

9    *Imports (U.S.), Inc*., 457 F.3d 968–69 (9th Cir. 2006).

10           Defendants argue the following specific claims and arguments are improperly

11   raised for the time in plaintiffs' motion for summary judgment and opposition and should be

12   disregarded.  The court addresses each in turn.

13                    a.  Reliance on the 2006 MOU in support of the argument that the Nosoni
                          Creek claim is not time barred.  ECF No. 133-1 at 5–7.
14

15           The 2006 MOU is not alleged in the Fourth Amended Complaint, or included in

16   the Administrative Record.  A plaintiff may not plead new facts in opposition to a summary

17   judgment motion solely to toll the statute of limitations.  *Wasco Prods., Inc. v. Southwall Techs.,*

18   *Inc*., 435 F.3d 989, 992 (9th Cir. 2006).  The court does not consider the 2006 MOU as a basis for

19   tolling with respect to the Nosoni Creek claim.

20                    b.  The assertion that "users of the truck ramp had to possess a permit or
                          other authority by the Forest Service," which would be an NHPA
21                        undertaking triggering Section 106, under the Nosoni Creek claim.
                          ECF. No. 133-1 at 7:4-7.
22

23           Plaintiffs do not allege a permit or lack thereof for the alleged truck ramp project.

24   Fourth Am. Compl. (FAC) ¶ 53.  The court will not consider the issuing of a permit as an

25   undertaking triggering Section 106 because that is not the basis of the NHPA violation alleged in

26   the operative complaint.

27   /////

28
                                                    3

1

2

3
        c.  The assertion of a violation of the PA by not demarcating or excluding Coonrod Flat from the grazing permit, not monitoring the site, and not consulting with the plaintiffs prior to issuing the grazing permit. ECF No. 133-1 at 9–11.

4
      Plaintiffs allege violations of Section 106.  FAC ¶ 63.  The PA was drafted to

5
comply with the requirements of Section 106; it is a mechanism and the formal agreement

6
ensuring that the required Section 106 analysis is conducted.  AR 171.  The court will consider

7
the PA in the context of the Coonrod Flat claim.

8

9
        d.  Any substantive challenge to the Section 106 analysis performed in 2007 for the 2010 permit to Coonrod Flat, which is not pled in the Fourth Amended Complaint. ECF No. 133-1 at 9–11.

10
      While not expressly pled in the Fourth Amended Complaint, the Section 106

11
analysis is in the Administrative Record and relevant to the question of whether defendant

12
complied with its statutory obligations, a claim for which defendant had fair notice, as it is the

13
basis of the NHPA and NEPA claims.  The court will consider the challenge to the Section 106

14
analysis, while bearing in mind the NHPA and NEPA are procedural statutes, and do not

15
prescribe any substantive outcome.

16

17
        e.  Any claim regarding the sufficiency of notice in constructing the Bike Trail Loop at the Buck Saddle site. ECF No. 133-1 at 11–13.

18
      Plaintiffs plead the USFS "[failed] to disclose potential project impacts to the

19
Winnemem tribe before creating the bike trail," and "[failed] to develop a protection plan or

20
consult with the Winnemem before permitting the bike path."  Fourth Am. Compl. ¶¶ 68, 69.  The

21
court will consider this claim.

22

23
        f.  Any claim regarding the determination that the "sacred prayer rock" at Buck Saddle is not an archaeological feature. ECF No. 133-1 at 11–13.

24
      No such claim is included in the Fourth Amended Complaint, and the court will

25
not consider any argument referencing any such claim.

26
/////

27
/////

28

4

g.  Plaintiffs' argument that the USFS has violated the PA by not implementing protection measures in connection with the granting of a parking permit to Jones Valley Resort.  ECF No. 133-1 at 13–14.

Plaintiffs plead the "USFS has not completed a Section 106 process as required by the NHPA and Advisory Council regulations to avoid, minimize, or mitigate the adverse effects of the parking lot."  Fourth Am. Compl. ¶ 74.  Because the PA was entered into to comply with Section 106, and is in the Administrative Record, the court will consider it in this context as well.

h.  Plaintiffs' argument that discovery of a midden deposit in January 2010 at Antler's Bridge, which led to the issuance of the CalTrans ARPA permit in October 2010, was a "late discovery" that required a Section 106 evaluation under the NHPA.  ECF No. 133-1 at 14–15.

The Fourth Amended Complaint pleads only an ARPA and APA claim, not an NHPA claim.  FAC ¶ 82.  The court will not consider an NHPA claim with respect to Antler's Bridge.

2.  Motion to Strike Defendants' Declarations and Documents

Plaintiffs move to strike the (1) declaration of Peter Schmidt (Schmidt), an Archaeologist for the Shasta Lake Ranger District for the Shasta-Trinity National Forest, ECF No. 131-2; (2) prior declarations of Kristy Cottini (Cottini), a former District Ranger, and Winfield Henn (Henn), a former Heritage Program Manager/Tribal Relations Program Manager, ECF No. 131-2, Exs. A–E; (3) a memo concluding the "sacred prayer rock" at Buck Saddle was not an archaeological feature, and that "it would be difficult to determine if this sacred prayer rock is a traditional cultural property," AR 443–446; and (4) a letter from Gloria Silverthorne Gomes (Gomes), Chairperson of the United Tribe of Northern California, Inc. dated March 30, 2010, ECF No. 45.  Defendant submitted these documents in support of its motion for summary judgment to show there was no truck ramp project at the Nosoni Creek site and no parking lot project at the Rocky Ridge site.  ECF No. 131 at 11−12.  Plaintiffs argue defendant may not "plug important factual gaps in the record with unsubstantiated statements from former Forest Service officers," Mot. to Strike at 2, ECF No. 134, these documents are an attempt to impermissibly supplement the Administrative Record, and with regard to the Gomes letter, constitute "unauthenticated hearsay."  Second Mot. to Strike, ECF No. 140.

5

1          a.   Contents of Declarations

2               In Cottini's sworn declaration, she states that the only project the USFS undertook

3     in the proximity of the Nosoni Creek site was the Nosoni Bridge replacement project, for which it

4     conducted the appropriate environmental analysis under the NEPA, and appropriate evaluation

5     under the NHPA.  ECF No. 131-2, Ex. A.  Cottini's second sworn declaration states that the

6     USFS  never authorized a truck ramp project at Nosoni, although there is a pre-existing water

7     take-out point near the bridge, which appears to date back to the 1930s.  *Id.*, Ex. C.  Lastly,

8     Cottini's third sworn declaration states the USFS has never issued a parking permit at Rocky

9     Ridge for the Jones Valley Resort, authorized an overflow parking lot at the Rocky Ridge site, or

10    allowed for installation of a locked gate at that site.  *Id.*, Ex. C.

11              Henn declares that none of the surveys in the Nosoni Creek area has identified any

12    archeological resources as defined by 16 U.S.C. § 470bb(1), nor have any archeological sites or

13    resources been discovered at the Dekkas site.  *Id.*, Ex. E.  Henn notes there was some evidence of

14    historic use by Native Americans at the Coonrod Flat site, but no evidence of archeological

15    resources.  *Id.*  Henn also declares he does not know of any requirement under section 110 of the

16    NHPA that the USFS must create protection plans on a site-by-site basis, and he believes the

17    Shasta-Trinity Forest Plan does contain guidelines and standards regarding preservation of

18    historic properties consistent with section 110.  *Id.*

19              In his sworn declaration, Schmidt states he has been employed by USFS as a

20    litigation coordinator since February 2013, and has been assigned to the Shasta-Trinity National

21    Forest in this case.  ECF No. 131-2, ¶ 2.  Schmidt states he has reviewed the declarations of

22    Cottini, who retired from the USFS in January 2014, and Henn, who retired in 2011.  *Id.* ¶ 5.

23    Schmidt says that after reviewing the record and consulting with others, he found the facts about

24    the Nosoni site contained in Cottini's declarations remained accurate, confirmed by the fact that

25    no documents indicate the USFS undertook a truck ramp project or performed any improvement

26    work on a truck ramp at that site.  *Id.* ¶ 8.  Schmidt also found Cottini's assertions regarding the

27    Rocky Ridge site remained true.  *Id.* ¶ 10.  Additionally, Schmidt avers he conducted a thorough

28    review of the USFS records to ensure that the Administrative and Supplemental Record were

6

1   complete, and found no documents evidencing final decisions for truck ramp or parking lot

2   projects at either the Nosoni or Rocky Ridge site. *Id.* ¶¶ 11−12.  Lastly, Schmidt agrees with

3   Henn's 2010 declaration in concluding that section 110 of the NHPA does not require the USFS

4   to create a protection plan on a site-by-site basis. *Id.* ¶ 13.

5           Defendant contends it is not offering the declarations of Cottini, Henn and Schmidt

6   to impermissibly supplement the administrative record for the court's review and determination

7   of the merits of plaintiffs' APA claims.  Opp'n, ECF 136 at 12.  "Instead, the Forest Service

8   offers the declarations as evidence to support its factual attack on the Court's jurisdiction,

9   including over the Nosoni Bridge truck ramp and Rocky Ridge parking lot claims, because there

10  is no final agency action as to either claim that can be reviewed by the Court under the APA." *Id.*

11                     b.   October 2012 Memo

12          The October 2012 memo from Shasta Trinity National Forest Heritage Resources

13  Manager Julie Cassidy states that on September 22, 2010, Schmidt and Cassidy went to visit the

14  Buck Saddle site to find the "sacred prayer rock" previously pointed out by Mark Franco to

15  Cassidy and USFS Resource Specialist Cindy Luzietti on January 29, 2007.  AR 443–446.  The

16  memo states that Schmidt and Cassidy examined the archeological boundaries of the "sacred

17  prayer rock," and the bike trail that was built in close proximity. *Id.*  Photographs of the "sacred

18  prayer rock," bike trail and surrounding proximity are attached to the memo. *Id.*  Cassidy

19  concluded the "sacred prayer rock" was not an archaeological feature, and determined there is no

20  known ethnographic place name for the location of the rock. *Id.*  The memo also states that

21  because of the lack of archival data, it would be difficult to determine if the rock is a traditional

22  cultural property. *Id.*  Finally, the memo states there was no visible displacement of rocks or a

23  ramp on the bike trail. *Id.*

24                     c.   Letter from Gloria Gomes

25          Lastly, in a March 30, 2010 letter, Gomes identifies herself as a Chairperson of the

26  United Tribe of Northern California, Inc. and a person of Winnemem Wintu descent.  ECF No.

27  45.  She requests this suit be dismissed on behalf of those of Winnemem Wintu descent. *Id.*

28  /////

1          d.   Discussion

2          The Ninth Circuit has consistently limited the ability of parties to supplement a

3   factual or administrative record. Because the court must always consider at the outset whether it

4   has jurisdiction, it may consider evidence for the limited purpose of determining whether the

5   challenged actions were "final." *See Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1181

6   (D. Or. 2002) (denying motion to strike extra-record declarations, with limitation on use of extra-

7   record evidence to preclude judicial determination whether agency's decision is arbitrary and

8   capricious).

9          The court has reviewed the declarations and finds them to be related to the inquiry

10  of whether agency action was taken sufficient to constitute "final agency action" that supports the

11  court's jurisdiction.  The declarations are not impermissible attempts at post-hoc rationalization,

12  because they are not intended and will not be considered as evidence of the defendant's rational

13  decision-making, nor will the court defer to the conclusions contained therein.  The court

14  considers them only as evidence relevant to the question of whether the agency action was final, a

15  question relevant to the court's jurisdiction.  The motion to strike the declarations is DENIED.

16         As to the October 2012 memo, AR 339–342, plaintiffs argue it was drafted six

17  years after the Decision Memo regarding the Clikapudi Trail Loop and three years after the

18  litigation began, and is an impermissible "post-hoc" rationale for decision, Mot. to Strike at 3,

19  ECF No. 134.  *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) ("post-hoc"

20  rationale for decisions based on an inadequate record is improper); *Sw. Ctr. for Biological*

21  *Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("[P]ost-decision information

22  [] may not be advanced as a new rationalization either for sustaining or attacking an agency's

23  decision.").  Defendants respond that the October 2012 memo is part of the administrative record

24  and the deadline for plaintiffs to file motions on the adequacy of the record expired on

25  February 28, 2014.  Opp'n at 12, ECF No. 136.

26         However, '[j]udicial review of an agency decision typically focuses on the

27  administrative record in existence at the time of the decision and does not encompass any part of

28  the record that is made initially in the reviewing court."  *Sw. Ctr. for Biological Diversity*,

1    100 F.3d at 1450.  While the Ninth Circuit has crafted narrow exceptions to this rule, *see Lands*

2    *Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005), these exceptions should not undermine

3    the general rule and do not permit an agency "to supply post-hoc rationalizations for its actions."

4    *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014); *see also*

5    *Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984).

6           Here, the PA for Compliance with Section 106 for the Clikapudi Trail Loop was

7    issued in July 2006 and the Decision Memo for the project was issued in October 2006,

8    AR 431-442.  The October 2012 memo describes an assessment of the area performed in

9    September 2010, nearly four years after the decision regarding the Trail Loop was made.

10   Because the October 2012 memo contains post-hoc rationalizations in support of an earlier

11   agency decision, the memo should be excluded from the court's review.  The motion to strike the

12   memorandum is GRANTED.

13          The Gomes letter is relevant neither to the question of jurisdiction nor the agency's

14   decision making, and the court does not consider it in making its decision.  The motion to strike it

15   is GRANTED.

16      C. Undisputed Facts

17          The undisputed facts are taken from the Administrative Record ("AR").[1]  The

18   WWT has historically occupied areas within the Shasta-Trinity National Forest, primarily in the

19   McCloud River watershed, Mt. Shasta, and Jones Valley, California.  AR 859.  It is not a

20   federally recognized Indian tribe.  AR 469; 79 Fed. Reg. 4748-02 (Jan. 29, 2014).  Regardless, the

21   parties have a longstanding relationship concerning permits and planning of USFS projects.  *See,*

22   *e.g.*, AR 818 (referencing a 1973 permit "to carry forward the traditions of the Wintu Indian

23   tribe"); AR 56 (In 2002 USFS pledge to "focus on closer collaboration between the Forest

24   Service and the Winnemem Wintu on future projects to avoid impacts to identified Native

25   American sites"); AR 920 (2004 letter stating "the Winnemem-Wintu and the Forest Service have

26   had a long and positive working relationship").  Plaintiff Caleen Sisk-Franco was appointed as

27   _____

28          [1]  The AR is several sets of documents with consecutive Bates number pagination.

                                        9

1   Spiritual Leader and Headperson of the WWT effective January 1, 2002.  AR 850.  Plaintiff Mark

2   Franco was also given tribal leadership responsibilities, in August 2002.  AR 857.

3   In early 2001, the USFS entered into a Programmatic Agreement ("PA") with the California State

4   Historic Preservation Officer ("SHPO") and the Advisory Council on Historic Preservation

5   ("ACHP").  AR 71.  Compliance with the procedures established by an approved programmatic

6   agreement satisfies the agency's NHPA Section 106 responsibilities[2] for all individual

7   undertakings[3] covered by the PA until it expires or is terminated by the SHPO or ACHP.  36

8   C.F.R. § 800.14.  Under the PA, the USFS agreed to implement protective measures for historic

9   properties impacted by undertakings, including excluding historic properties from undertakings,

10   marking the historic properties' boundaries, using buffer zones around the properties, and

11   monitoring the properties.  AR 79, 93.  The PA requires the USFS to "seek information and

12   advice from 'Native Americans,' and other interested persons likely to have knowledge of or

13   concern about historic properties, and incorporate such information into identification, evaluation,

14   and treatment of historic properties."  AR 102.  "Native American tribes, organizations, and

15   individuals, and other interested persons who express concerns regarding historic properties

16   related to specific undertakings covered by [the PA] shall be consulted regarding identification,

17          [2] Section 106 of the NHPA provides a mechanism to promote the Congressional policy
18   that "the historical and cultural foundations of the Nation should be preserved as a living part of
     our community life . . . ."  16 U.S.C. § 470(b).  The mechanism is a command to federal agencies
19   to consider the effect of their actions on registered historic resources:

20              The head of any Federal agency having . . . jurisdiction over a
                proposed Federal . . . undertaking . . .  shall, prior to the approval
21              of the expenditure of any Federal funds on the undertaking or prior
                to the issuance of any license . . . take into account the effect of the
22              undertaking on any district, site, building, structure, or object that is
                included in or eligible for inclusion in the National Register [of
23              Historic Places]. The head of any such Federal agency shall afford
                the Advisory Council on Historic Preservation . . .  a reasonable
24              opportunity to comment with regard to such undertaking.

25   16 U.S.C. § 470f.

26          [3] "Undertaking means a project, activity, or program funded in whole or in part under the
27   direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a
     Federal agency; those carried out with Federal financial assistance; and those requiring a Federal
28   permit, license or approval."  36 C.F.R. § 800.16.

evaluation, treatment, and management of historic properties for those undertakings, pursuant to [the PA]." AR 103.

1.  Nosoni Creek

In 2000, the USFS began a project to replace the Nosoni Creek Bridge, which is not eligible for inclusion on the National Register of Historic Places. AR 801.  In April 2000, the USFS met with plaintiffs Mark Franco and Caleen Sisk-Franco to discuss the project, and plaintiffs shared their concern regarding effects to culturally significant grape vines and use of an old roadbed near a home site. AR 811.  The USFS issued a Decision Memo finding "no extraordinary circumstances" "that might cause this action to have significant effect upon the human environment," in May 2000. AR 808.  The memo also outlined mitigation measures, including that the wild grape cuttings will be replaced in disturbed areas immediately adjacent to the creek. AR 807.  In 2000, after the new bridge had been designed, the USFS discussed the design with the WWT. AR 51.

In August 2001, the WWT discovered that, contrary to the USFS's representations, a large amount of dirt was placed on the old road bed and the home site. AR 52.  In addition, a large old oak tree and culturally significant manzanita vines were destroyed and buried. AR 58, 59, 812.  Throughout the last three months of 2001, the WWT and USFS discussed mitigation measures. AR 813.  While some mitigation was attempted, the site was largely destroyed. *See, e.g.*, AR 55–56 ("The site and its setting, therefore, still had meaning for the Winnemem Wintu until the most recent disturbance [in 2001] during bridge reconstruction.").  Consequently, in January 2002, the USFS proposed a meeting to discuss "what we can do on future projects and hopefully reach agreement on what needs to be done on the site." AR 53–54.  In an attempt to prevent similar incidents in the future, the WWT and the USFS  discussed entering into a Memorandum of Understanding (MOU). *See, e.g.*, AR 815 (email from Winnfield Henn to Sharon Heywood, USFS Officer, saying, "I understand that you have promised Wintu some sort of MOU and this may be the vehicle we need to end the matter that will also satisfy Judy[4] that

---

[4]  Judy's last name or position is not immediately clear from the record.

1    issue is closed . . . .  I think we need something SIGNED by the Wintu that the case is over.").  In

2    2002, the WWT sent a draft MOU to the USFS.  AR 193.  While the USFS and WWT discussed

3    the MOU over the next several years, *see, e.g.*, AR 859 (Draft Agenda for January 28, 2003

4    Winnemem Wintu MOU Meeting), it was not executed until 2006.  AR 875.

5                              2.   Dekkas Project

6              The Dekkas site is a "rock island" that rises above the McCloud River.  The WWT

7    had permits to use the land as a "religious, doctoring, and herb gathering" site, dating back to

8    1973.  AR 816-844.  The site is used primarily for sacred ceremonies and healing activities.  AR

9    864.  The most recent permit was issued by USFS to the WWT in 1995; it expired in 2005.  AR

10   845.  The permit is not exclusive, and is only required for use when there are 75 or more people

11   present at one time, such as for ceremonial gatherings.  AR 862.  In June 2003, the USFS signed a

12   Decision Notice and Finding of No Significant Impact (FONSI) for the Gilman Road Shaded

13   Fuelbreak ("Dekkas Project"), which involved cutting some vegetation and clearing brush near

14   the Dekkas site.  AR 217–226.

15             In a 2008 meeting between the WWT and USFS, the group discussed options for

16   the WWT's use of the Dekkas site.  The USFS said it would look into possibilities of a sale to the

17   WWT or its use and control of a small area of the site.  AR 1007.

18                              3.   Coonrod Flat

19             Coonrod Flat is a National Historic Place as of 2007, located east of Mt. Shasta in

20   Siskiyou County.  AR 336, 337, 930–944.  It is a traditional cultural property, "associated with

21   events of a spiritual or ceremonial nature and as a place of mythological importance."  AR 939.  It

22   is significant to the WWT "as a ceremonial area and a doctoring place," AR 934, and the WWT

23   has held a ceremony there annually in August since the 1970s.  AR 904, 922, 934.  In June 2002,

24   the WWT sent a letter to the USFS detailing "desecration" to the site with evidence of intrusion

25   and use by non-WWT members.  AR 904.  Mark Franco, on behalf of the WWT, requested a

26   meeting to discuss protecting the site.  *Id*.  In August 2003, Franco also requested an extension of

27   the permit issued allowing the WWT to hold the August ceremony.  AR 924.

28

                                          12

1    The USFS had issued a permit to Wesley Truax, not a party to this action, in April

2    2003.  AR 908–916.  The permit was effective until December 2009 and allowed Truax to graze

3    his livestock and cattle on the land.  AR 909.  In July 2004, the USFS responded to Franco's

4    August 2003 request, stating that while the USFS could not grant an exclusive use permit for

5    Coonrod Flat, "fencing the Coonrod area to keep cattle out of camping and ceremonial areas is

6    possible to do," noting "we need to work with the holder of the grazing permit in that area to

7    accomplish this."  AR 921.  In October 2007, an Archaeological Renaissance Report was issued

8    addressing a "grazing undertaking," which would continue the permit, authorizing 112 cow/calf

9    pairs and three bulls to graze from July through October each year.  AR 956.  The Report's

10   recommendations to exclude cattle from the archaeological sites were to: 1) make sure developed

11   water sources are located away from recorded sites and 2) use salting sites to lure cattle away

12   from site locations.  AR 959.  Truax's permit was renewed in 2010, through 2019.  AR 962–63.

13   In August 2010, the special use permit for the August ceremonial activity was issued to the

14   WWT.  AR 970.

15          4.   Clikapudi/Buck Saddle

16   Buck Saddle is at the top of a ridge, and there are at least 13 prehistoric and

17   historic sites in the general area.  AR 263.  In 2004, the USFS began planning a mountain bike

18   trail that looped off the existing Clikapudi Trail at Buck Saddle.  In October 2006, the USFS

19   /////

20   signed a Decision Memo to add an approximately one-mile trail to the existing Clikapudi Trail

21   Loop.  AR 328-338.

22          In July 2006, a PA for compliance with Section 106 was issued for the project,

23   noting the existence of an historic property, the Jones Valley/Buck Saddle.  AR 431.  The

24   agreement noted that the proposed bike trail would not impact the historic property, had been

25   specifically designed to avoid the site, and no activity would occur in the site boundary.  *Id*.

26          5.   Rocky Ridge

27   Rocky Ridge was included on the National Register of Historic Places in 2007.

28   AR 1000.  Beginning in 2006, Jones Valley resort sought to use the Rocky Ridge Point

13

1   campground for overflow parking.  AR 996.  The USFS issued an Archaeological

2   Reconnaissance Report for the parking lot expansion project in February 2009.  AR 1009.  The

3   report notes a "known prehistoric archaeological site" at the proposed resort location, and states

4   that "all earth-moving activities would occur outside the boundary, to the east of the site."  AR

5   1010.  "The [prehistoric site] will require monitoring during the construction process."  *Id*.  No

6   Native American consultation, including with the WWT, was conducted for this project.  AR

7   1011.

8               6.  Antler's Bridge

9               In March 2006, the U.S. Department of Transportation and the Federal Highway

10  Administration proposed to replace Antler's Bridge in Shasta County, California and filed an

11  Historic Property Survey Report.  AR 1047.  In January 2010, while contractors for CalTrans

12  were excavating the site, cultural artifacts were discovered.  AR 509.  Excavation ceased, and

13  Mark Franco and representatives of the California Department of Transportation (CalTrans),

14  which was responsible for the project, the Office of Historic Preservation and the  USFS met to

15  discuss next steps.  AR 380, 382.  In October 2010, the  USFS issued an Archaeological

16  Resources Protection Act (ARPA) permit authorizing CalTrans to process and screen soils

17  removed from the Antler's Bridge project in January 2010, and from additional excavation areas,

18  to determine whether there are any archaeological resources in the soils and, if so, to take

19  appropriate action under the ARPA to preserve them.  *See* AR 422, 538, 542, 544–46, 689.

20  II.      STATUTORY FRAMEWORK

21          A.      NEPA

22              The NEPA is a procedural statute enacted to ensure the federal government makes

23  major decisions significantly affecting the environment only after considering the impacts of

24  those decisions and exploring possible alternatives.  42 U.S.C. §§ 4321, 4331; 40 C.F.R.

25  § 1501.1.  Its main purpose is to ensure that federal agencies take a "hard look" at the

26  environmental consequences of their proposed actions in advance of a final decision to proceed.

27  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989); *Vermont Yankee*

28  *Nuclear Power Corp. v. Nat'l Res. Def. Council*, 435 U.S. 519, 558 (1978).  Although NEPA

1    establishes procedures by which agencies must consider the environmental impacts of their

2    actions, it does not dictate the substantive results of agency decision-making. *Robertson*, 490

3    U.S. at 350; *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000)

4    ("NEPA does not mandate particular substantive results, but instead imposes only procedural

5    requirements.") (quotations and citation omitted).

6         B.    NHPA[5]

7         "Section 106 of the NHPA requires federal agencies to consider the effect of any

8    undertaking on any site that is eligible for inclusion in the National Register of Historic Places

9    before expending federal funds or approving any licenses in connection with the undertaking."

10   *Winnemem Wintu Tribe v. U. S. Dep't of Interior*, 725 F. Supp. 2d 1119, 1138 (E.D. Cal. 2010)

11   (citing 16 U.S.C. §§ 470(b)(4) and 470f.  For federal undertakings at historic sites eligible for the

12   National Register, the NHPA requires federal agencies to consult with Indian tribes that attach

13   religious or cultural significance to the affected properties.  *See* 54 U.S.C. § 302706(a)–(b); 36

14   C.F.R. § 800.2(c)(2).  "Section 106 of NHPA is a 'stop, look, and listen' provision that requires

15   each federal agency to consider the effects of its programs."  *Muckleshoot Indian Tribe v. U. S.*

16   *Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).  The obligation to consult with Indian tribes

17   extends only to federally recognized Indian tribes.  *See id.*; 54 U.S.C. § 300309 (defining "Indian

18   Tribe" or "tribe" as one "which is recognized as eligible for the special programs and services

19   provided by the United States to Indians because of their status as Indians"); 36 C.F.R. §

20   800.16(m) (same); *see also id.* § 800.2(c)(2)(ii)(C) ("Consultation with an Indian tribe must

21   recognize the government-to-government relationship between the Federal Government and

22   Indian tribes"); 79 Fed. Reg. 4748-02 (Jan. 29, 2014) (listing all eligible Indian tribes).  Non-

23   federally recognized tribes such as the WWT are entitled only to notice and information, as

24   interested members of the public.  36 C.F.R. § 800.2(d).  This court's disposition of the parties'

25

26

27

28

[5] The NHPA was repealed on December 19, 2014, by the National Park Service and Related Programs Act, Pub. L. No. 113-287, 128 Stat. 3094 (codified in various sections of title 54 of the United States Code), "except with respect to rights and duties that matured, penalties that were incurred, or proceedings that were begun before the date of enactment of [the National Park Service and Related Programs Act]."  Pub. L. No. 113-287, sec. 7.  The parties agreed at hearing the repeal does not render the NHPA inapplicable to this case.

1   cross-motions on the NHPA claim turns on whether the USFS complied with its responsibilities

2   under Section 106 of the NHPA.  Under 54 U.S.C. § 306108, the USFS is required to "take into

3   account the effect of [an] undertaking on any district, site, building, structure, or object that is

4   included in or eligible for inclusion in the National Register."

5          C.    APA

6           This court may consider violations of the NHPA and NEPA only within the

7   confines of the APA.  *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071,

8   1080 (D.S.D. 2009).  Under the APA, the court's review is limited to the administrative record.

9   5 U.S.C. § 706.  When reviewing agency action under the APA, the court "will reverse the

10   agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise

11   contrary to law." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citing 5 U.S.C. §

12   706(2)).  The burden of proof is on the plaintiffs.  *Kleppe v. Sierra Club*, 427 U.S. 390, 412

13   (1976); *Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded by*

14   *statute on other grounds as stated in L.M. v. Capistrano Unified School Dist.*, 556 F.3d 900, 910

15   (9th Cir. 2008).

16           Review under the arbitrary and capricious standard is narrow, and the court may

17   not substitute its judgment for that of the agency.  *See Lands Council v. McNair*, 537 F.3d 981,

18   987 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council,*

19   *Inc.*, 555 U.S. 7, 20 (2008) (citing *Earth Island Inst. v. U. S. Forest Serv.*, 442 F.3d 1147, 1156

20   (9th Cir. 2006)).  The agency's decision should only be reversed "if the agency relied on factors

21   Congress did not intend it to consider, 'entirely failed to consider an important aspect of the

22   problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so

23   implausible that it could not be ascribed to a difference in view or the product of agency

24   expertise.'" *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015)

25   (citations omitted).  To overturn any decision by the USFS here, the court must find "a clear error

26   of judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989) (quoting

27   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

28

1         Claims based on a failure to act under 5 U.S.C. § 706(1) can be sustained where

2 the failure is "in the face of clear statutory duty or is of such a magnitude that it amounts to an

3 abdication of statutory responsibility." *Franco v. U.S. Dep't of the Interior,* No. CIV S-09-1072,

4 2012 WL 3070269, at *12 (E.D. Cal. July 27, 2012) (citing *ONRC Action v. BLM*, 150 F.3d 1132,

5 1137 (9th Cir. 1998) (citation omitted); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S.

6 55, 55 (2004) ("claim [under the APA] can proceed only where a plaintiff asserts that an agency

7 failed to take a discrete agency action that it is required to take").

8   III.   <u>LEGAL STANDARD</u>

9         A court must grant a motion for summary judgment in whole or in part, "if . . .

10 there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

11 matter of law." Fed. R. Civ. P. 56(a). This is a "threshold inquiry" into whether a trial is

12 necessary at all, that is, whether "any genuine factual issues . . . properly can be resolved only by

13 a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v.*

14 *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[6] The court does not make findings of fact or

15 determine the credibility of witnesses, *id.* at 255; rather, it must draw all inferences and view all

16 evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v.*

17 *Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Whitman v. Mineta*, 541 F.3d 929, 931 (9th

18 Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for

19 the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting

20 *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

21         The moving party bears the initial burden of "informing the district court of the

22 basis for its motion, and identifying those portions of the [record] which it believes demonstrate

23 the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

24 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings" and

25 "designate specific facts" in the record to show a trial is necessary to resolve genuine disputes of

26

27         [6] Even after the 2010 amendment to Rule 56, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains

28 unchanged." Fed. R. Civ. P. 56, notes of advisory comm. on 2010 amendments.

1    material fact.  *Id.*  The nonmoving party "must do more than simply show that there is some

2    metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "Only disputes over

3    facts that might affect the outcome of the suit under the governing law will properly preclude the

4    entry of summary judgment."  *Anderson*, 477 U.S. at 248.

5    IV.    <u>ANALYSIS</u>

6            A.    <u>Claim One: Violation of NHPA, NEPA, and APA (Damage to Nosoni Creek)</u>

7                    Plaintiffs allege that the USFS violated the NHPA by not designating the Nosoni

8    Bridge as an historic site, not conducting a NHPA Section 106 evaluation for the project, and

9    approving the project without consulting with them.  FAC ¶ 52.  They further allege defendants

10   violated the NEPA by failing to initiate a NEPA process and failing to conduct an Environmental

11   Assessment with regard to the "major federal action" of building a truck ramp on the Nosoni

12   Creek site.  *Id.* ¶ 53.  The government argues each of the claims is time-barred, and no such truck

13   ramp exists.  The government also argues the May 2000 Decision approving the Nosoni Creek

14   Bridge Replacement Project, AR 806–09, triggered the statute of limitations for that project;

15   plaintiffs argue the MOU executed in 2006, AR 875, was the final agency action.

16                   Plaintiffs were required to file any APA claims related to the Nosoni Bridge

17   project within six years from the date of the decision by the USFS.  28 U.S.C. § 2401; *Gros*

18   *Ventre Tribe v. U.S.*, 469 F.3d 801, 814 n.12 (9th Cir. 2006).  A claim against an administrative

19   agency "first accrues," within the meaning of § 2401(a), as soon as but not before the person

20   challenging the agency action can institute and maintain a suit in court.  *See, e.g., Crown Coat*

21   *Front Co. v. U.S.*, 386 U.S. 503, 510-11 (1967); *Citizens Legal Enforcement & Restoration v.*

22   *Connor*, 762 F. Supp. 2d 1214 (S.D. Cal. 2011), *aff'd*, 540 F. App'x 587 (9th Cir. 2013).

23                   In this case, on January 14, 2002, Robert Hammond, a District Ranger with the

24   USFS, sent a letter to Florence Jones, the WWT's former spiritual leader, and Mark Franco.  In

25   the letter, he suggests a meeting "in order to reach closure on the Nosoni Creek Bridge project,"

26   and "to discuss what we can each do differently on future projects and hopefully reach agreement

27   on what needs to be done on the site."  AR 45.  Hammond notes that USFS engineers notified him

28   of a "field meeting on November 1, 2001 for the purposes of inspecting the Nosoni Creek Bridge

1    placement – their final inspection."  *Id*.  "The outcome of the final inspection was that he had

2    completed all Forest Service contract requirements."  *Id*.  On August 29, 2002, Ranger Cottini

3    sent a letter to the WWT noting that Mark Franco met with the  USFS on May 20, 2002, "to reach

4    agreement on several unresolved issues concerning this project."  AR 55–56.  The letter states

5    that during the meeting, "Franco noted that there is nothing left that can be restored . . . it was

6    agreed by all present that mitigation would need to focus on closer collaboration between the

7    Forest Service and Winnemem Wintu on future projects to avoid impacts to identified Native

8    American sites."  *Id*. at 56.  Based on the record, the WWT had notice of the failure to include

9    them in consultation as early as 2000 when the Decision Memo was issued, throughout 2001

10   when they were consulted about the project, and as late as 2002.  *See, e.g.,* AR 31, 292.  The

11   meetings and MOU issued after 2002 were focused on mitigation efforts for future projects, not

12   Nosoni Bridge.  At best, the statute of limitations lapsed in 2008, during the project's closure

13   stage.  In a similar case, the six-year statute of limitations for an action challenging USFS use of

14   Custer National Forest ("CNF") lands by wild horses accrued on the date the USFS gave notice of

15   the final environmental impact statement in the Federal Register, rather than on the date plaintiff

16   became aware of the action.  *Cloud Found., Inc. v. Kempthorne*, 546 F. Supp. 2d 1003, 1011

17   (D. Mont. 2008).  In *Cloud Foundation*, a sister court considered a challenge to the alleged failure

18   of the USFS to acknowledge historical use of CNF in its "Forest Plan."  The USFS defendants

19   argued the claims were time-barred because the time for filing them commenced when the Forest

20   Plan was published in the Federal Register in 1987, not when plaintiffs objected to the plan in

21   2004, learned of the USFS's alleged refusal to modify that plan in 2005 or 2006, or during the

22   creation of a memorandum of understanding.  The court agreed with defendants, finding the

23   statute of limitations began to run in 1987 when the CNF Forest Plan Record of Decision was

24   published in the Federal Register in 1987, not when plaintiff, despite not having formed as an

25   entity in 1987, later became aware of the plan.  Here, as in *Cloud Foundation,* the claims are

26   time-barred, and summary judgment is GRANTED in favor of defendant.

27

28

1    In addition, plaintiffs have not produced any evidence showing a truck ramp

2    project has ever existed.  A search of the record reveals nothing, and defendant has provided

3    sworn declarations averring no truck ramp project exists.  Without any final agency action to

4    review, the court GRANTS summary judgment to defendant as to this claim on this separate

5    ground as well.

6        B.  Claim Two: Violation of NHPA and the APA (Interference with Winnemem's Use of
         Cultural Property at Dekkas)

7

8    Plaintiffs' allegation that the cutting of the old-growth manzanita is a violation of

9    the PA does not state a claim of NHPA violation.  First, however, contrary to defendant's

10   argument, this claim is not time barred.  In June 2003, the USFS published a Decision Notice and

11   Finding of No Significant Impact (FONSI) for the Gilman Road Shaded Fuelbreak ("Dekkas

12   Project").  AR 226–30.  This triggered the limitations statute.  "'Publication in the Federal

13   Register is legally sufficient notice to all interested or affected persons regardless of actual

14   knowledge or hardship resulting from ignorance.'"  *Shiny Rock Mining Corp. v. U.S.,* 906 F.2d

15   1362, 1364 (9th Cir. 1990) (quoting *Friends of Sierra R.R., Inc. v. ICC,* 881 F.2d 663, 667–68

16   (9th Cir. 1989)).  Within six years, plaintiffs pleaded in their original April 2009 complaint that

17   the USFS acted "in direct violation of [the PA]" and "failed to include the Winnemem in the

18   planning of these acts of deliberate desecration."  Original Compl. ¶¶ 36, 37..  The Dekkas claims

19   alleged in the operative fourth amended complaint therefore relate back to the timely original

20   complaint and are not time-barred.  *See* Fed. R. Civ. P. 15(c).

21   Turning to the merits, this court's previous order dismissed the claim as previously

22   pled with leave to amend because "plaintiffs do not allege that any portion of the Dekkas Site is

23   eligible for inclusion in the National Register."  *Winnemem*, 725 F. Supp. 2d at 1140.  Plaintiffs

24   still do not allege such facts, saying only that the  USFS 1) violated the NHPA by not consulting

25   with them about the Dekkas project and 2) failed to follow its proposed, written mitigation plans,

26   as memorialized in the PA.  Fourth Am. Compl. at 7-8.  Under both NEPA and NHPA, when an

27   agency has entered into a Memorandum of Agreement, "it has voluntarily assumed an obligation

28   that is enforceable . . . ."  *Tyler v. Cisneros*, 136 F.3d 603, 608-09 (9th Cir. 1998) (citations and

1    quotation marks omitted); *see also* 36 C.F.R. § 800.6(c) ("A memorandum of agreement . . . shall

2    govern the undertaking and all its parts.")).  Plaintiffs participated in the planning process for the

3    Dekkas project, meeting with the  USFS in June 2002 to discuss the project.  *See Winnemem*,

4    725 F. Supp. 2d at 1142; AR 214 (meeting notes); AR 229 (FONSI stating WWT had been

5    consulted about the project).

6           Moreover, because the old-growth manzanita cannot be restored, however

7    understandably distressing the destruction is, plaintiffs' claims are moot.  *See Headwaters, Inc. v.*

8    *Bureau of Land Management*, 893 F.2d 1012, 1015–16 (9th Cir. 1990) ("Where the activities

9    sought to be enjoined have already occurred, and the [] courts cannot undo what has already been

10   done, the action is moot.").  Summary judgment is GRANTED as to this claim in favor of

11   defendant.

12          C.  Claim Three: Violation of NHPA and APA (Coonrod Cultural Site)

13          Plaintiffs argue the issuance of a grazing permit for the Coonrod site is evidence of

14   the failure of the USFS to protect an historic property from adverse effects of an undertaking, and

15   therefore violates the NHPA.  FAC at 13-14.  Defendant responds that this claim is moot because

16   a new permit was issued in 2010, superseding the 2005 permit, and a Section 106 assessment was

17   conducted in 2007.  Def.'s MSJ at 10.

18          Defendant's argument as to mootness is unpersuasive.  To demonstrate mootness

19   in an NHPA case such as this one, defendant must meet a heavy burden.  *Cantrell v. City of*

20   *Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001).  When a case is challenged as moot, "[t]he

21   question is whether there can be any effective relief."  *Nw. Envt'l Def. Ctr. v. Gordon*, 849 F.2d

22   1241, 1244–45 (9th Cir. 1988) (citation and quotation marks omitted); *see also Sierra Club v.*

23   *U.S. Forest Serv.*, 93 F.3d 610, 614 (9th Cir. 1996) ("An action is moot if the court cannot grant

24   any effective relief." (citation omitted)).  Here, that a new permit was issued does not extinguish

25   plaintiff's potential for effective relief.  The alleged harm is ongoing, and therefore the allegation

26   defendants have failed to protect the historic site remains viable.  Specifically, the new permit

27   allows for grazing on the land, which is the alleged harm of which plaintiffs complain.  That

28   permit may be enjoined, which would be effective relief.  *See Slockish v. U.S. Fed. Highway*

1    *Admin.*, 682 F. Supp. 2d 1178, 1184 (D. Or. 2010) (finding NHPA claim not moot though project

2    completed because of "ongoing harm" that can be mitigated).

3               The Section 106 analysis conducted in 2007, *see* AR 955, also does not extinguish

4    this claim.  Under the terms of the PA, defendants were required to comply with 36 C.F.R. § 800

5    for undertakings that may adversely affect historic properties and consult with the public, or

6    individuals and organizations with a demonstrated interest in the undertaking due to their

7    concern, before performing an undertaking on the land.  Here WWT had a demonstrated interest

8    and defendant did not consult with it.  AR 78.  This is a "failure to act" claim in that defendant

9    "failed to take a discrete agency action that it is required to take," *Norton*, 542 U.S. at 64

10   (emphasis omitted), making injunctive relief available and appropriate.

11              Finding the claim is not moot, the court turns to the merits, that is, the sufficiency

12   of the 2007 Section 106 analysis.  An NHPA analysis for the Section 106 process requires an

13   agency

>    to make a reasonable and good faith effort to identify historic
>    properties; determine whether identified properties are eligible for
>    listing on the National Register . . . ; assess the effects of the
>    undertaking on any eligible historic properties found; determine
>    whether the effect will be adverse; and avoid or mitigate any
>    adverse effects. The [agency] must confer with the State Historic
>    Preservation Officer. . . and seek the approval of the Advisory
>    Council on Historic Preservation . . . .

19   *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir.

20   2010) (citation and quotation marks omitted).  36 C.F.R. § 800.1(a) further requires an agency to

21   consult with "parties with an interest in the effects of the undertaking on historic properties,

22   commencing at the early stages of project planning."

23              Specifically, once an historic property has been identified, the agency shall "[s]eek

24   information, as appropriate, from consulting parties, and other individuals and organizations

25   likely to have knowledge of, or concerns with, historic properties in the area, and identify issues

26   relating to the undertaking's potential effects on historic properties."  36 C.F.R. § 800.4(a)(3).

27   Consulting parties are defined to include federally recognized Indian tribes, *id*. § 800.2(c)(2), *see*

28   *also supra page 16*, certain individuals and organizations with demonstrated interest in the

22

1    undertaking due to their concern with the undertaking's effects on historic properties, *id.* §
2    800.2(c)(5), as well as the public, *id*. § 800.2(d).

3           Here, Coonrod Flat is a National Historical Site as of 2007, meaning that
4    consideration and consultation with interested parties is required under the NHPA before an
5    undertaking can commence.  And even though the WWT is not federally recognized, it still has a
6    sufficiently demonstrated and documented interest in Coonrod Flat, of which the USFS had
7    knowledge, AR 336, to give it consulting status as to this property under either 36 C.F.R.
8    § 800.2(c)(5) (demonstrated interest) or § 880.2(d) (the public).  Thus, even though a Section 106
9    analysis was conducted in 2007, the requirements of NHPA were still not satisfied, as a
10    consulting party as defined under 36 C.F.R. § 800.2 was not in fact consulted.  And no Section
11    106 analysis was conducted for Coonrod Flat other than the one in 2007, which failed to fulfill
12    the consultation requirement when the 2010 permit was issued.

13           Given Coonrod Flat is a National Historical Site as of 2007, yet a Section 106
14    analysis fulfilling the consulting requirement of NHPA was never conducted, and given plaintiffs
15    have shown ongoing damage, plaintiffs are entitled to summary judgment and the court GRANTS
16    their motion to this extent.

17       D.   <u>Claim Four:  Violation of NHPA, NEHA, and the APA (Damage to Buck Saddle</u>
                <u>Prayer Site)</u>
18

19           In 2004, the USFS began planning a mountain bike trail that looped off the
20    existing Clikapudi Trail.  In October 2006, the USFS signed a Decision Memo to add an
21    approximately one-mile trail to the existing Clikapudi Trail Loop at the Buck Saddle site.  AR
22    328–38.  Plaintiffs argue defendant's failure to develop a protection plan or consult with the
23    WWT before permitting the bike path violates the NHPA, and the failure to perform any
24    environmental analysis on the effects of the bike path violates the NEPA.  They argue the USFS
25    was aware of the WWT's interest in the area, and should have, under the PA and NHPA,
26    consulted with the WWT before issuing its Decision Memo.  AR 876.  Defendant says it
27    complied with the requirements of the NHPA and the NEPA for the bike trail project and
28    conducted a proper Section 106 analysis.  Def.'s Mot. at 10–11.

1    An agency has a general duty to "provide the public with information about an

2    undertaking and its effects on historic properties and [to] seek public comment and input."

3    36 C.F.R. § 800.2(d)(2).  An undertaking has an "effect" when the undertaking "may alter

4    characteristics of the property that may qualify the property for inclusion in the National Register

5    . . . [including] alteration to features of a property's location, setting, or use . . . ."  *Id.* § 800.16(i).

6    An "effect" is "adverse" when it may "diminish the integrity of the property's location, . . . setting

7    . . . , feeling, or association."  *Id.* § 800.5(a)(1).  The regulations specify that certain individuals

8    and organizations, known as "consulting parties," are to be more formally involved in the

9    agency's NHPA review.  *Id.* § 800.16(i).  In particular, the agency must invite the state historic

10   preservation officers, tribal historic preservation officers, local government representatives for

11   those entities that  have jurisdiction over the area at issue, and the project applicant to participate

12   in the NHPA process as consulting parties.  *Id.* § 800.2(a)(4).  In addition to those who are

13   consulting parties as a matter of right, other interested individuals or organizations "may

14   participate as consulting parties due to the nature of their legal or economic relation to the

15   undertaking . . . or their concern with the undertaking's effects on historic properties," *id.* §

16   800.2(c)(5), if they request participation in writing and the agency determines they should be

17   granted consulting party status, *id.* § 800.3(f)(3).  Section 800.2(c) identifies the intended

18   participants in the Section 106 process.  These participants are divided into two classes,

19   consulting parties and interested persons.  Consulting parties may include the Agency Official,

20   SHPO, and the Advisory Council.  *Id.* § 800.2(c)(1).

21   In July 2006, a PA for Compliance with Section 106 was issued for the Clikapudi

22   project.  AR 431–432.  The Agreement notes the existence of an historic property, the Jones

23   Valley/Buck Saddle, and states that the proposed bike trail will not impact the area, has been

24   designed to avoid the site, and no activity will occur in the site boundary.  This conclusion is

25   consistent with a finding that an undertaking is not "adverse."  *See* 36 C.F.R. § 800.5(a)(1) ("An

26   adverse effect is found when an undertaking may alter, directly or indirectly, any of the

27   characteristics of a historic property that qualify . . . for inclusion in the National Register in a

28   manner that would diminish the integrity of the property . . . .");  *see also Neighborhood Ass'n of*

24

1    *The Back Bay v. Fed. Transit Admin.*, 393 F. Supp. 2d 66, 74 (D. Mass. 2005) (the finding of "no

2    adverse effect" means an undertaking does not meet the criteria of an "adverse effect" under 36

3    C.F.R. § 800.5(b)).  The Ninth Circuit has affirmed a district court's finding that, when there is no

4    adverse effect found by the agency in developing the project, the court "only needed to consider

5    the views of interested parties, and it did so."  *Presidio Golf Club v. Nat'l Park Serv.,* 155 F.3d

6    1153, 1163–64 (9th Cir. 1998).  The Ninth Circuit considered a claim similar to that in this case

7    in *Muckleshoot Indian Tribe,* 177 F.3d at 800.  There, plaintiff argued the  USFS "ignored its

8    claims that numerous other places of historical importance were situated" on the land proposed

9    for an undertaking.  *Id.* at 806.  The Ninth Circuit found that because "the Forest Service

10   continued to seek the requested information over a period of time," "and the Forest Service had

11   previously conducted research of its own to identify relevant traditional cultural properties," it

12   was "unable to conclude that the Forest Service failed to make a reasonable and good faith effort

13   to identify historic properties."  *Id*. at 807.

14          Here, the  USFS conducted a Section 106/NEPA categorical exclusion analysis for

15   the project, and plaintiffs have not shown any error in that analysis.  *See* AR 437.  NHPA

16   consultation was not required because, based on the scope of the project, no historic properties

17   would be affected.  AR 431.  *See La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v.

18   U.S. Dep't of the Interior*, No. 11-00400, 2013 WL 4500572, at *9 (C.D. Cal. Aug. 16, 2013),

19   *aff'd*, 603 F. App'x 651  (9th Cir. 2015) (granting summary judgment to defendants who

20   adequately sought comment from public, and plaintiff, not a recognized Indian tribe, not entitled

21   to consultation).  There is no evidence the Section 106 analysis conducted was not supported by

22   proper analysis.  Summary judgment is GRANTED in favor of defendant as to the Buck Saddle

23   claim.

24          E.  Claim Five: Violation of NHPA and the APA (Damage to Rocky Ridge)

25          Plaintiffs allege defendant has not complied with NHPA Section 106 in allowing

26   Jones Valley Resort to use the Rocky Ridge campground, an historic site, as an overflow parking

27   lot.  Fourth Am. Compl. ¶¶ 41, 74.  Defendant argues no such Rocky Ridge overflow parking

28   project exists.  Def.'s Mot. at 12.  The ARR for Rocky Ridge campground states that the area

1    "has been used as an overflow parking area for Jones Valley Resort." AR 451.  This is consistent

2    with the notes of a January 2007 meeting of the WWT and USFS to discuss a proposal to include

3    the campground in Jones Valley Resort's permit as an overflow parking lot, "which [it has been]

4    for several years." AR 465.  The record shows the WWT has been consulted in considering

5    whether to allow for parking in the future. AR 476 (representatives of USFS and WWT "agree

6    that use of the loop should involve consultation of the Wintu Tribe").  More critically, however,

7    there is no evidence of a permit for overflow parking in the record.

8            As discussed above, under the APA, a plaintiff must establish final agency action

9    for this court to act on a claim.  Final agency action must "mark the consummation of the

10   agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature"

11   and "the action must be one by which rights or obligations have been determined, or from which

12   legal consequences will flow." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'r*,

13   543 F.3d 586, 597 (9th Cir. 2008) (holding also that "agency action that does not impose an

14   obligation, deny a right, or fix some legal relationship is not judicially reviewable due to lack of

15   finality" (internal quotations and citations omitted)).  "[J]ust as the 'final agency action' in a

16   NEPA claim must be a 'major federal action,' the 'final agency action' in an NHPA claim must

17   be a 'federal undertaking.'" *Karst Envtl. Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1296

18   (D.C. Cir. 2007); *Comm. for Pres. of Seattle Fed. Reserve Bank Bldg. v. Fed. Reserve Bank of*

19   *San Francisco*, No. C08-1700, 2010 WL 1138407, at *4 (W.D. Wash. Mar. 19, 2010) (cautioning

20   against finding "every incremental step toward a final agency action" reviewable).  Without any

21   final action or undertaking to review, the court GRANTS summary judgment on this claim to

22   defendant. *See San Carlos Apache Tribe v. U.S.*, 272 F. Supp. 2d 860, 886 (D. Ariz. 2003), *aff'd*,

23   417 F.3d 1091 (9th Cir. 2005) (dismissing NHPA where "plaintiffs fail to identify the final

24   agency action that is reviewable under the APA").

25       F.   Claim Six: Violation of ARPA and the APA (Interference with and Failure to Protect
            Archaeological Resources at the Antler's Bridge Site)
26

27            In plaintiffs' fourth amended complaint, they allege the following final agency

28   action with respect to their sixth claim: 1) the failure of the USFS to consult with the WWT after

1   the inadvertent discovery of potentially historically significant land during the excavation of the

2   Antler's Bridge site, and 2) exclusion from USFS meetings to resolve the findings, in violation of

3   the ARPA permit.  Fourth Am. Compl. ¶ 79.

4         The ARPA provides that "[n]o person may excavate, remove, damage, or

5   otherwise alter or deface" any archaeological resource located on public or Indian lands unless

6   "pursuant to a permit."  16 U.S.C. § 470ee(a).  Under the ARPA, federally recognized Indian

7   tribes must be notified about an ARPA permit that might harm sites of religious or cultural

8   importance. 43 C.F.R. § 7.7(a)(1).  Specifically, an "Indian tribe" is "[a]ny tribal entity which is

9   included in the annual list of recognized tribes published in the Federal Register by the Secretary

10  of the Interior."  *Id*. § 7.3(f)(1).  Other, non-federally recognized Native American groups "may"

11  be provided notice of an ARPA permit.  43 C.F.R. § 7.7(a)(2).  It is undisputed the WWT is not

12  on the list of federally recognized Indian tribes.

13        Here, the discovery at Antler's Bridge was made in January 2010, and the ARPA

14  permit was issued in October 2010.  A meeting was held regarding the late discovery in February

15  2010.  Mark Franco represented the WWT at the meeting, with representatives from USFS also

16  attending.  AR 380–402.  The agenda indicates a scheduled time for "Native American Concerns"

17  presented by Mark Franco, as well as agenda items for proposed mitigation measures and

18  construction needs going forward.  *Id*.  The record demonstrates the WWT was consulted

19  regarding the project and provided input about the protection of cultural resources as intended by

20  ARPA, even though notice to the WWT in this instance was not mandatory.

21        Summary judgment is GRANTED for defendants as to this claim.

22     G.  Remedies

23        The  USFS asserts plaintiffs seek the following forms of relief that are unavailable

24  and go beyond the court's jurisdiction to grant: granting plaintiffs de facto "consulting party

25  status" on all USFS undertakings under the NEPA and NHPA, granting plaintiffs' exclusive use

26  of sacred sites, and a determination that cultural items held by the USFS belong to plaintiffs and

27  should be repatriated to them.  Plaintiffs request "[a] declaratory judgment stating that

28

27

1   Defendant's acts and omissions violate the NHPA; [and] a preliminary and permanent injunction

2   against further damage to the Coonrod Cultural Site."  Fourth Am. Compl. ¶ 66.

3           The court does not have the authority to circumvent federal tribal recognition

4   processes and allow for de facto federal recognition of the WWT in any grant of relief.  It is,

5   however, within the court's authority to fashion a remedy that fits the particular facts of the case

6   before it.  In light of the court's granting of plaintiffs' motion for summary judgment on claim

7   three, the court may consider enjoining the Coonrod Flat permit and require the USFS to engage

8   in consultation with the WWT before further or continued grazing based on the permit.  *See*

9   *Muckleshoot Indian Tribe*, 177 F.3d at 815 (enjoining further activities on land until USFS

10  satisfies NHPA and NEPA obligations); *Confederated Tribes & Bands of the Yakama Nation*,

11  2015 WL 1276811, at *9 (ordering agency to set aside findings and reengage in consultation

12  process before pursuing undertaking).  That said, under NEPA and NHPA, a grant of injunctive

13  relief is an extraordinary remedy that involves the balancing of equities and requires a fact

14  specific analysis of the circumstances of an individual case.  *Weinberger v. Romero–Barcelo*, 456

15  U.S. 305, 312–13 (1982).  Injunctions are equitable remedies; they do not issue "as a matter of

16  course."  *Id.* at 311.  And a violation of NEPA or the NHPA alone does not compel the issuance

17  of an injunction.  *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir.

18  1995), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th

19  Cir. 2011).

20          Accordingly, the court orders briefing on the issue of the appropriate remedy on

21  claim three, including the effect of enjoining the Coonrod Flat permit.

22  V.      CONCLUSION

23          Defendant's motion for summary judgment is GRANTED as to claims one, two,

24  four, five and six.  Plaintiffs' motion is GRANTED as to claim three (Coonrod Flat).  Plaintiffs'

25  motion to strike the October 2012 memo on Clikapudi Trail Loop is GRANTED.  Plaintiffs'

26  remaining motions to strike are DENIED.

27  /////

28  /////

1           Simultaneous opening briefs on the appropriate remedy on claim three are due by

2    close of business on May 6, 2016, with any responses due June 3, 2016.  The court will notify the

3    parties if it requires a hearing on this matter.

4           IT IS SO ORDERED.

5    DATED:  March 31, 2016.

6

7    _____

8    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29